Filed 11/19/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TIFFANY BRINKLEY,<br><br>　　　Plaintiff and Appellant,<br><br>　　v.<br><br>MONTEREY FINANCIAL SERVICES, INC.,<br><br>　　　Defendant and Respondent. | D066059<br><br><br><br>(Super. Ct. No.<br>37-2013-00071119-CU-MC-NC) |

APPEAL from an order of the Superior Court of San Diego County,

Timothy M. Casserly, Judge.  Affirmed in part, reversed in part, and remanded with

directions.

Niddrie Fish & Addams, Niddrie Addams, David A. Niddrie, John S. Addams;

Keegan & Baker, Patrick N. Keegan; Wickman & Wickman, Steven A. Wickman and

Christina E. Wickman for Plaintiff and Appellant.

Call & Jensen, Matthew R. Orr and Melinda Evans for Defendant and Respondent.

# I.

## INTRODUCTION

Plaintiff Tiffany Brinkley appeals from an order of the trial court compelling her to arbitrate her individual claims and dismissing her class claims. Brinkley filed a putative class action against defendant Monterey Financial Services, Inc. (Monterey), asserting statutory violations arising from allegations that Monterey unlawfully recorded and/or monitored telephone conversations that Brinkley had with Monterey's representatives. Monterey moved to compel Brinkley to arbitrate her individual claims and to dismiss Brinkley's class claims, based on an arbitration agreement contained in a contract that Brinkley entered into with a third party who subsequently assigned Brinkley's contract to Monterey. The trial court ordered Brinkley to arbitrate her individual claims, and dismissed the class claims, as Monterey had requested.

On appeal, Brinkley raises a number of challenges to the trial court's order compelling arbitration. She contends that (1) the claims fall outside the scope of the arbitration agreement; (2) the arbitration clause is unconscionable and therefore unenforceable; and (3) the court erred in dismissing her class action claims because the parties agreed that an arbitrator would determine whether class arbitration is available under the contract.

We conclude that Brinkley's claims fall within the scope of the arbitration agreement and that the arbitration agreement is enforceable, with the exception of one provision that we find to be unconscionable under the applicable jurisdiction's law. We conclude, however, that it is possible to sever the unconscionable provision from the

remainder of the arbitration agreement and from the contract as a whole.  We therefore affirm the trial court's order compelling arbitration of Brinkley's claims.  However, because the parties' agreement delegates to the arbitrator the question whether class arbitration is available under the contract, we reverse that portion of the trial court's order compelling the arbitration of Brinkley's individual claims, alone, and dismissing Brinkley's class claims.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Monterey Financial Services provides three services to its customers, including consumer financing, loan servicing, and debt collecting.  Real Estate Investor Education (REIE) was one of Monterey's customers.

On or about August 10, 2011, Brinkley signed up to receive six real estate coaching sessions through REIE for $4,195.  Brinkley paid REIE $850, and financed the remainder of the purchase price through REIE's "Retail Installment Contract" (the RIC).  Once Brinkley's financing was approved, she had 30 days to complete an e-signature process.  During this period of time, she had the ability to access the RIC online.  Brinkley executed the RIC with her e-signature on August 24, 2011.  The RIC provided that Brinkley could cancel the contract within three days of e-signing it if she were to change her mind.

The RIC contains a choice of law provision that provides:  "This Agreement shall be governed by and interpreted and constructed in accordance with the law of your state of residence as indicated on the address section hereof completed by you, as applied to

3

contracts between residents of such state entered into and to be performed wholly within such state."  Brinkley identified her residence as being in the state of Washington.

The RIC also contains the following arbitration provision:

"AGREEMENT DISPUTE RESOLUTION

"ARBITRATION: By signing this Agreement, you agree that, except as provided below, any claim or dispute arising out of or in any way related to this Agreement, whether past, present or future, or any matter of fact, law, background, circumstance, or other matter of any kind whatsoever relating to this Agreement, shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association. You further acknowledge and agree that the sole and exclusive venue for such binding arbitration shall be San Diego, California. The decision by the arbitrator or arbitrators shall be final and binding on all parties, and may be entered in any court of competent jurisdiction for enforcement. Such a decision shall include the payment of all fees and costs of the prevailing party. The determination of the 'prevailing party' shall be made by the arbitrator or arbitrators. The AGREEMENT FOR DISPUTE RESOLUTION shall not limit the right of any party to take non-judicial actions to enforce security interests and all rights related thereto, or to take judicial actions for (i) the enforcement of arbitration decisions, or (ii) the protection of any party pending arbitration decisions.

"SMALL CLAIMS PROCEDURE: Additionally, because the purpose of the AGREEMENT FOR DISPUTE RESOLUTION is to promote fast and inexpensive resolution of claims and disputes, Buyer, Seller and Seller's assignee remain free to choose the small claims court procedure to resolve any dispute or claim, as defined above, that is within the monetary jurisdictional limit of the court. Buyer, Seller and Seller's assignee agree, however, that any claims, counterclaims and/or disputes, as defined above, of any sort which are in excess of the small claims court jurisdictional monetary limit must be arbitrated before the American Arbitration Association and in accordance with its rules."

In addition, the RIC informs consumers that the "Seller may assign this Agreement to any third party without prior notice to you," and that "[u]pon any such assignment,

4

such third party will become the holder of this agreement and your creditor."  It further informs consumers regarding the party to whom the assignment may be made, stating, "Seller intends to assign this agreement to Monterey Financial Services, [I]nc., 4095 Avenida de la Plata, Oceanside, CA 92056 ('Monterey')," and explains that "[a]fter the assignment of this Agreement to Monterey, all questions concerning the terms of this Agreement or payments should be directed to Monterey at its address indicated above."  Later, in a separate box that includes signature lines where the assignment can be effectuated, the consumer is told:  "TERMS CONTAINED IN THIS BOX ARE NOT PART OF THE BUYER'S AGREEMENT."  According to Monterey, REIE assigned the RIC to Monterey shortly after the contract was executed.

At some point, Brinkley stopped making payments on the RIC.  According to Brinkley, she never received all of the coaching sessions from REIE, which went out of business in August 2012.  Monterey took the position that Brinkley owed it the remaining payments, and began collection efforts against her.  During Monterey's collection efforts, Monterey called Brinkley, and Brinkley called Monterey.[1]

According to the allegations in Brinkley's complaint, Brinkley made telephone calls to and received telephone calls from employees, officers, and/or agents of Monterey between December 2012 and March 2013.  Brinkley also alleges that Monterey failed to inform Brinkley at any time that it was recording the telephone conversations between its

_____

[1]    On December 1, 2014, Brinkley filed a request for judicial notice in this court. Brinkley seeks judicial notice of records related to a small claims action involving Monterey and Brinkley.  We conclude that these documents are not relevant to the issues raised in this appeal, and we therefore decline to take judicial notice of the documents.

representatives and Brinkley.  During these calls, Brinkley revealed her identity and shared personal information.  Brinkley believed that her calls were confidential and were not being monitored or recorded.

Brinkley filed a putative class action against Monterey in October 2013, asserting causes of action for invasion of privacy, unlawful recording of telephone calls, and unlawful and unfair business practices.  The class that Brinkley seeks to represent includes persons who made telephone calls to or received telephone calls from Monterey while located or residing in California or Washington, and who were not provided notice that the calls might be recorded or monitored.  Brinkley asserts that Monterey's conduct in recording her confidential communications without her knowledge was an invasion of her privacy and a violation of the California Invasion of Privacy Act (CIPA; Pen. Code, §§ 630-637.5), which was enacted "to address concerns that 'advances in science and technology that have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.' "  (*Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377, 1388.)  Among other things, the CIPA requires that all parties consent to the recording of

6

a conversation involving confidential communication. (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 769.)[2]

Monterey moved to compel arbitration of Brinkley's individual claims, and sought dismissal of Brinkley's class claims.

After considering briefing and declarations from the parties, the court determined that the parties had entered into a valid arbitration agreement, that the parties had not agreed to arbitrate class claims, and that Brinkley's claims fell within the scope of the arbitration provision. The trial court ordered the parties to arbitrate Brinkley's individual claims, and dismissed Brinkley's class claims.

Brinkley filed a timely notice of appeal from the trial court's order.

III.

DISCUSSION

Brinkley challenges the trial court's order requiring her to arbitrate her individual claims and dismissing her class claims. She contends that (1) her claims fall outside the

---

[2]     Specifically, Penal Code section 632, subdivision (a) imposes liability on "[e]very person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio . . . ." Subdivision (c) of Penal Code section 632 addresses the term "confidential communication" by providing: "The term 'confidential communication' includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

7

scope of the arbitration provision, (2) the arbitration provision is unconscionable and may not be enforced, and (3) the court erred in dismissing her class claims.

A.    *Standard of review*

In a petition to compel arbitration, the party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.) The party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense, including that an arbitration provision is invalid or otherwise unenforceable. (*Ibid.*)

On appeal, "[w]hen 'the language of an arbitration provision is not in dispute, the trial court's decision as to arbitrability is subject to de novo review.' [Citation.] Thus, in cases where 'no conflicting extrinsic evidence is introduced to aid the interpretation of an agreement to arbitrate, the Court of Appeal reviews de novo a trial court's ruling on a petition to compel arbitration.' " (*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 707; see also *Rebolledo v. Tilly's, Inc.* (2014) 228 Cal.App.4th 900, 912 [where ruling on petition did not hinge on credibility of extrinsic evidence, but rather was based on legal interpretation of arbitration agreement, de novo review is appropriate].)

The parties appear to agree that the de novo standard of review applies to the issues raised by Brinkley's appeal.

B.      *Analysis*

     1.      *Brinkley's claims fall within the scope of the arbitration provision*

         a.      *Applicable law*

             i.      *The Federal Arbitration Act applies*

Brinkley asserts that the Federal Arbitration Act (9 U.S.C. § 1 et seq.; FAA) does not govern the arbitration agreement at issue.

Arbitrators derive their powers from the parties' voluntary submission of disputes for resolution in a nonjudicial forum.  Under the FAA, a valid arbitration agreement arises from the parties' consent.  (*Stolt-Nielsen S. A. v. Animalfeeds Int'l Corp.* (2010) 559 U.S. 662, 682 (*Stolt-Nielsen*).)  The primary purpose of the FAA is to ensure that agreements to arbitrate are enforced according to their terms.  (*Stolt-Nielsen*, *supra*, at p. 682.)  Arbitration agreements are construed to give effect to the parties' contractual rights and expectations.  (*Ibid.*)

The FAA applies to a contract that "evidences a transaction involving interstate commerce . . . ."  (*Shepard v. Edward Mackay Enterprises, In*c. (2007) 148 Cal.App.4th 1092, 1101.)  "Section 2 of the FAA provides in relevant part: 'A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'  (9 U.S.C. § 2.)"  (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 234-235 (*Pinnacle*).)  "This statute stands as 'a congressional declaration of a liberal federal policy favoring

9

arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.' " (*Ibid.*) Essentially, "Congress passed the FAA 'to overcome courts' refusals to enforce agreements to arbitrate.' " (*Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 55.)

Brinkley contends that the parties agreed only to the application of state rules for any arbitration under their contract, and did not contemplate that the contract would be governed by the FAA, given that the RIC provides that it is "to be interpreted and constructed under the law of the consumer's resident state," and that it applies only " 'to contracts between residents of such state entered into and to be performed wholly within such state.' "

The RIC provision to which Brinkley refers is a choice-of-law provision that immediately follows the arbitration clause in the RIC, in a paragraph titled "Governing Law." This paragraph provides:

> "This Agreement shall be governed by and interpreted and constructed in accordance with the law of your state of residence as indicated on the address section hereof completed by you, as applied to contracts between residents of such state entered into and to be performed wholly within such state."

Brinkley suggests that "[b]ecause the parties eliminated interstate commerce from the RIC contract, they clearly evidenced their intent that only Washington or California state law applied and not the FAA." Brinkley's argument is misdirected.

The relevant language from the RIC contemplates the existence of an interstate transaction. The choice-of-law provision indicates that the law that is to be applied is the law of the consumer's state, *as if* the contract at issue had been entered into in that state

10

and wholly performed in that state. This language is not suggesting that the RIC *is* such a contract or that it does not involve interstate commerce; rather, it expresses the intent of the parties to apply the law of the purchaser's state to the RIC, despite the fact that it may have been entered into by residents of different states (i.e., the consumer and REIE). As Brinkley concedes, the RIC at issue was entered into between Brinkley, a Washington resident, and REIE, a Utah entity, and set the terms of Brinkley's purchase of services from REIE. The RIC thus clearly evidences an interstate transaction.

Given the nature of the RIC and its choice-of-law provision, the very existence of which suggests that the transaction at issue in the contract might be undertaken by individuals and/or entities residing in different jurisdictions and thereby involve interstate commerce, we conclude that the RIC "evidences a transaction involving interstate commerce." Therefore, contrary to Brinkley's contention, the FAA and its rules apply.

ii. *To the extent the application of state law is necessary, Washington state law applies*

Brinkley asserts on appeal that the law of Brinkley's state of residence, Washington, governs interpretation of the contract.[3]

---

[3]     Brinkley further asserts that "[t]o the extent the appeal involves class members who lived in California when they signed the RIC contract, California law applies." Given that no class has been certified, and given that the questions that are to be addressed with respect to Monterey's motion to compel arbitration involve issues regarding the *RIC that Brinkley entered into with nonparty REIE*, we are disinclined to agree with Brinkley that this court should look to California law for purposes of "class members who lived in California when they signed" their own contracts with REIE or some other entity whose contracts were assigned to Monterey.

11

The FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." (*Moses H. Cone Hospital v. Mercury Constr. Corp*. (1983) 460 U.S. 1, 24.) However, even when the FAA applies, such that "federal arbitrability law" applies, there remains "[t]he general rule in interpreting arbitration agreements," which "is that courts 'should apply ordinary state-law principles that govern the formation of contracts.' " (*Cape Flattery Ltd. v. Titan Mar., LLC* (9th Cir. 2011) 647 F.3d 914, 920 (*Cape Flattery*), quoting *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 (*Kaplan*).) We therefore consider which state's legal principles apply in this case.

Despite Brinkley's contention that the contract requires application of Washington law, Brinkley additionally asserts that "[i]n this case, the question whether Washington or California law applies is immaterial," because, she contends, the laws of Washington and California do not differ with respect to the issues raised in her appeal. Because this statement is not entirely accurate, and because it is important that we give effect to the parties' agreement, we address the question of which jurisdiction's law applies.

The parties have agreed that the law of the state of Washington will govern their agreement. We must ascertain whether the parties' choice-of-law provision should be given effect. A court analyzes the enforceability of a choice-of-law provision in a consumer adhesion contract by applying the approach adopted by the Supreme Court in *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459 (*Nedlloyd*) with respect to arm's-length negotiated contracts. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 917-918.) "California . . . has no public policy against the enforcement of

12

choice-of-law provisions contained in contracts of adhesion where they are otherwise appropriate. [Citations.] More importantly, *Nedlloyd*'s analysis contains safeguards to protect contracting parties, including consumers, against choice-of-law agreements that are unreasonable or in contravention of a fundamental California policy." (*Id.* at p. 917.)

Under *Nedlloyd*, "[i]n determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 187, which reflects a strong policy favoring enforcement of such provisions." (*Nedlloyd, supra*, 3 Cal.4th at pp. 464-465.) The standards set forth in Restatement section 187, subdivision (2) are the following: " 'The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either [¶] (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or [¶] (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [section] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.' " (*Nedlloyd, supra*, at p. 465.)

The parties in this case appear to essentially agree that Washington and California law are, in most respects, substantially similar with respect to the issues raised in this

appeal.[4]  Neither party has argued that Washington's law should not apply on the ground that Washington has "no substantial relationship to the parties or the transaction" or because an application of Washington law "would be contrary to a fundamental policy of a state [that] has a materially greater interest" than Washington.  (*Nedlloyd*, *supra*, 3 Cal.4th at p. 465.)  We therefore conclude that it is appropriate to give effect to the parties' agreement with respect to the choice-of-law provision, and apply the law of Washington to those matters where state law principles govern.

Given our conclusion that the parties' choice of Washington law should be given effect, we note that Washington courts look to federal courts for guidance in determining whether parties have agreed to arbitrate a dispute when there has been a determination that federal law applies to the dispute.  (See *Peninsula School District 40 v. Public School Employees of Peninsula* (1996) 130 Wn.2d 401, 413 [applying federal law in context of deciding whether public sector labor-management dispute was arbitrable pursuant to collective bargaining agreement].)  We therefore consider federal case law and Washington case law, where applicable, in addressing the parties' contentions on appeal.

---

[4]     Brinkley asserts, "There is no substantial conflict between Washington and California law."  Monterey acknowledges, "Monterey agrees that the trial court's order compelling arbitration of Brinkley's individual claims and dismissing the class claims is correct regardless of which law is applied."  Monterey notes that Washington and California law differ slightly in their approaches to assessing the unconscionability of a contract, which we discuss further in footnote 6, *post*.

### iii. *Brinkley's claims fall within the scope of the RIC's arbitration provision*

Brinkley contends that the trial court erred in concluding that her claims fall within the scope of the arbitration provision in the RIC. The relevant language from the RIC regarding its scope is the following:

> "By signing this Agreement, you agree that, except as provided below, any claim or dispute *arising out of or in any way related to this Agreement*, whether past, present or future, or any matter of fact, law, background, circumstance, or other matter of any kind whatsoever relating to this Agreement, shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association." (Italics added.)

Brinkley's complaint asserts three causes of action: (1) invasion of privacy, (2) unlawful recording of telephone calls, and (3) unlawful and unfair business practices. Brinkley asserts that her causes of action do not arise out of, and are not related to, the RIC. Rather, she contends that under any potentially applicable law, her "claims of unlawful recording and monitoring of telephone calls fell outside the scope of the arbitration agreement," because "REIE expressly limited the contract to '*legal* rights of enforcement.' "

"[T]he question of arbitrability—whether [an] agreement creates a duty for the parties to arbitrate [a] particular grievance—is . . . an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (*AT&T*

*Technologies v. Communications Workers* (1986) 475 U.S. 643, 649.)[5]

"Courts resolve the threshold legal question of arbitrability of the dispute by examining the arbitration agreement without inquiry into the merits of the dispute. If the dispute can fairly be said to invoke a claim covered by the agreement, any inquiry by the courts must end. Washington State has a strong public policy favoring arbitration of disputes." (*Owners Ass'n v. Burton Landscape* (2009) 148 Wn.App. 400, 403-404.)

Doubts concerning the scope of arbitrable issues "should be resolved in favor of arbitration." (*Moses H. Cone Hospital v. Mercury Constr. Corp.*, *supra*, 460 U.S. at pp. 24-25.) This gives due regard to the federal policy favoring arbitration and the presumption of arbitrability. (See *AT&T Technologies v. Communications Workers*, *supra*, 475 U.S. at p. 650.) Notwithstanding a federal policy that favors arbitration, however, it is clear that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' [Citation.] We cannot expand the parties' agreement to arbitrate in order to achieve greater efficiency. The Federal Arbitration Act 'requires piecemeal resolution when necessary to give effect to an arbitration agreement.' " (*Tracer Research Corp. v. National Environmental Services Co.* (9th Cir. 1994) 42 F.3d 1292, 1294-1295 (*Tracer*).)

---

5       The parties apparently agree that it was proper for the trial court to decide whether Brinkley's claims of invasion of privacy, unlawful recording, and unfair business practices are arbitrable, but disagree about whether the trial court answered the question correctly. "Because neither party argues that the arbitrator should decide [the question of arbitrability], there is no need to apply the rule requiring ' "clear and unmistakable" ' evidence of an agreement to arbitrate arbitrability." (*Granite Rock Co. v. Int'l Brotherhood of Teamsters* (2010) 561 U.S. 287, 297, fn. 5.)

Courts consistently recognize that the duty to arbitrate a dispute arises from the language of the contract itself. (See *Stein v. Geonerco, Inc.* (2001) 105 Wn.App. 41, 45.) "An agreement for the submission of a dispute to arbitration defines and limits the issues to be decided." (*Sullivan v. Great American Ins. Co.* (1979) 23 Wn.App. 242, 246.) Although public policy strongly favors arbitration as a remedy for settling disputes, arbitration "should not be invoked to resolve disputes that the parties have not agreed to arbitrate." (*King County v. Boeing Co.* (1977) 18 Wn.App. 595, 603.)

"Four principles guide us when determining whether the parties agreed to submit a particular dispute to arbitration: [¶] (1) the duty to submit a matter to arbitration arises from the contract itself; (2) the question of whether parties have agreed to arbitrate a dispute is a judicial one unless the parties clearly provide otherwise; (3) a court should not determine the underlying merits of a dispute in determining the arbitrability of an issue; and (4) arbitration of disputes is favored by the courts." (*Tacoma Narrows Constructors v. Nippon Steel-Kawada Bridge, Inc.* (2007) 138 Wn.App. 203, 214.) In addition, "[t]o rule that a particular dispute is not arbitrable under an arbitration agreement, 'the court must be able to say "with positive assurance" that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " (*Id.* at p. 216.)

Turning to the language of the RIC pertaining to the scope of the arbitration provision, we attempt to ascertain the meaning of "arising out of or in any way related to this Agreement."

Similar language has been "well explored by Ninth Circuit cases." (*Golden v. Dameron Hosp. Ass'n* (E.D.Cal. Sept. 19, 2012, No. Civ. S-12-0751 LKK/EFB) 2012 U.S.Dist. Lexis 134281, \*20 (*Golden*).) "[W]hen parties intend to include a *broad* arbitration provision, they provide for arbitration 'arising out of or relating to' the agreement." (*Cape Flattery*, *supra*, 647 F.3d at p. 922, italics added.) In circumstances in which an arbitration clause is phrased in broad and general terms, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." (*Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 582-583.)

When an arbitration clause is interpreted "broadly," it " 'reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract.' " (*Golden*, *supra*, 2012 U.S. Dist. LEXIS 134281 at \*21, quoting *Simula, Inc. v. Autoliv, Inc.* (9th Cir. 1999) 175 F.3d 716, 721 (*Simula*).) Stated differently, "[t]o require arbitration, [a party's] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." (*Simula*, *supra*, at p. 721.)

Brinkley alleges that her telephone conversations with representatives at Monterey were recorded without her knowledge or consent. All of her claims arise from this alleged conduct on Monterey's part. These telephone calls were initiated by Monterey and Brinkley in the facilitation of Monterey's attempt to collect on the debt it believed to

18

be due pursuant to the RIC.  We conclude that these factual allegations "touch matters" covered by the contract—namely, debt collection pursuant to the contract.

Brinkley contends that the RIC "expressly limited enforcement efforts under the agreement to 'all *legal* rights of enforcement.' "  She cites a provision in the RIC referring to REIE's rights in the case that the consumer defaults:

> "4. Seller's Rights upon Default. If you default in any way, Seller's [*sic*] may, without notice, demand immediate payment of the total amount owing under this Agreement. Seller may use all legal rights of enforcement."

Brinkley asserts that "Monterey's *illegal* enforcement efforts are therefore, by definition, outside the scope of the parties' agreement."  We disagree with Brinkley's analysis.  The arbitration provision in the RIC requires the parties to arbitrate "any claim or dispute arising out of or in any way related to this Agreement."  The *dispute* in this action is about the legality of Monterey's collection methods, i.e., its alleged unlawful recording of Brinkley's conversations with its representatives during its collection efforts without her consent.  The fact that Brinkley has *alleged* that Monterey (a) recorded her telephone conversations with its representatives, (b) that she did not consent to such recording, and (c) that Monterey has no valid defense to such conduct, merely raises the existence of a dispute about the legality of Monterey's conduct.  Brinkley's allegations that Monterey engaged in illegal collection efforts are insufficient to take Brinkley's claims outside the scope of the parties' arbitration provision on the ground that the RIC permits only legal collection efforts.  Brinkley's allegations simply place the legality of

19

Monterey's actions in dispute, and this dispute is related to the RIC, which by its terms allows Monterey to pursue collection of debts owed.

Brinkley relies on *Wagner v. Discover Bank* (D.Colo. Jan. 13, 2014, Civ. A. No. 12-cv-02786-MSK-BNB) 2014 U.S.Dist. Lexis 3682, *4-*5 (*Wagner*) to support her argument that her claims are not arbitrable. We find *Wagner* distinguishable.

In *Wagner*, the relevant arbitration provision stated: "In the event of any past, present or future claim or dispute (whether based upon contract, tort, statute, common law or equity) between you and us *arising from or relating to your Account*, any prior account you have had with us, your application, the relationships which result from your Account or the enforceability or scope of this arbitration provision, of the Agreement or of any prior agreement, you or we may elect to resolve the claim or dispute by binding arbitration." (*Wagner*, *supra*, 2014 U.S. Dist. LEXIS 3682 at *13, italics added.)

In concluding that the dispute in that case did not fall within the arbitration provision at issue, the *Wagner* court explained: "Despite such broad language, however, the agreement expressly applies only to disputes that 'aris[e] from or relat[e] to' an Account, a prior account, an application, the relationships resulting from the Account, or the scope and enforceability of the arbitration provision, Cardmember Agreement, or prior agreement. In this regard, the scope of the agreement is limited to disputes whose factual underpinnings arise from or relate to the specified categories." (*Wagner*, *supra*, 2014 U.S. Dist. LEXIS 3682 at *14.) Important for our purposes is the *Wagner* court's description of the factual basis for the plaintiff's claims in that case as related to the language of the arbitration agreement:

20

"Mr. Wagner's allegations specifically relate to the legality of Discover's acts when it went about its collection activities. He alleges unlawful conduct by Discover when it made numerous calls to his cell phone and used a prerecorded voice system. These allegations relate to the *manner* in which Discover attempted collection. Although the existence of a debt on the account and the right to collect the debt would 'arise from' or 'relate to' the Account, the legality of the manner in which collection is pursued does not. The manner of collection—whether calls were made, how frequently they were made, and what was said during them—has nothing to do with either the Account, the terms of the Cardmember Agreement, or the parties' relationship. See, e.g., *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995) (holding that antitrust claims that are not factually related to parties' contractual relationship were not subject to arbitration agreement).

"Discover *has not pointed to any term governing the account which specifies how it will collect on the account*, *and the arbitration agreement does not identify manner of collection as a dispute to be arbitrated*. Indeed, Mr. Wagner may succeed on his TCPA claims despite the existence of any account or relationship with Discover. Although the existence of the Account may have been the 'but for' cause of the alleged violations, that is not enough to establish that the claims arise from or relate to the Account or the parties' relationship resulting from the Account." (*Wagner*, *supra*, 2014 U.S. Dist. LEXIS 3682 at *15-*16, italics added.)

In this case, in contrast, Monterey has pointed to a specific term in the RIC itself that specifies that a default by the consumer will trigger a "demand [for] immediate payment of the total amount owing" and grants the "Seller" permission to "use all legal rights of enforcement" to collect the monies due. As we have explained, a dispute regarding the legality of any conduct Monterey undertook in its collection efforts is a "dispute" that is "related to" the terms of the RIC. *Wagner* is therefore distinguishable and is thus unpersuasive in this matter.

21

We conclude that the telephone calls that Brinkley alleges Monterey unlawfully recorded were related to the RIC. As a result, Brinkley's claims concerning the legality of the calls fall within the scope of the broad arbitration provision included in the RIC.

2.      *The arbitration provision is enforceable*

Brinkley raises two claims challenging the enforceability of the arbitration provision in the RIC, arguing that the clause should not be enforced because it violates public policy, and that the clause is unconscionable, both procedurally and substantively.

a.      *Public policy does not render the arbitration agreement unenforceable.*

Brinkley contends that the trial court erred in enforcing the arbitration agreement because it "is against public policy." Specifically, Brinkley argues that "[c]ontract provisions, like this one, which purport to mandate arbitration of individual claims involving illegal conduct and/or criminal activities should be void as a matter of public policy because they do little to discourage such practices."

Brinkley acknowledges that her argument in this regard must be premised on the FAA being inapplicable to the RIC, given that the FAA preempts state law attempts to invalidate arbitration agreements on the basis of public policy. As we have already concluded, however, the FAA does apply to the contract at issue here. Brinkley's argument that public policy requires courts not to enforce an arbitration agreement with respect to claims alleging illegal or criminal conduct must therefore be rejected. (See *Brown v. MHN Gov't Servs., Inc.* (2013) 178 Wn.2d 258, 266 (*Brown*) [pursuant to *AT&T*

22

*Mobility LLC v. Concepcion* (2011) 563 U.S. 333 (*Concepcion*), "state rules specific to arbitration that interfere with the purposes of the FAA are preempted"].)

        b.     *Unconscionability*

Brinkley contends that the trial court erred in determining that the RIC is not procedurally unconscionable. Brinkley contends that it is, maintaining that she was not provided "a meaningful choice and an opportunity to understand its terms." She further contends that the trial court erred in determining that the RIC is not substantively unconscionable, and asserts that the "arbitration fees and venue provision made arbitration cost prohibitive, and subjected Brinkley to having to pay for Monterey's attorney fees."

The Washington Supreme Court has "distinguished between 'procedural' unconscionability, involving blatant unfairness in the bargaining process and a lack of meaningful choice, and 'substantive' unconscionability, or unfairness of the terms or results." (*Torgerson v. One Lincoln Tower, LLC* (2009) 166 Wn.2d 510, 518 (*Togerson*).) Under Washington law, an agreement may be invalidated if it is either substantively *or* procedurally unconscionable. (*Hill v. Garda CL NW, Inc*. (2013) 179 Wn.2d 47, 55 (*Hill II*).[6]

_____

[6]     Although it appears that Washington law and California law are very similar for purposes of many of the issues raised in this appeal, this is one area in which the substantive law of the two states differs slightly. In California, the unconscionability of a contract term is considered with respect to both its alleged substantive and procedural unconscionability: "Both procedural unconscionability and substantive unconscionability must be shown, but 'they need not be present in the same degree' and are evaluated on ' "a sliding scale." ' [Citation.] '[T]he more substantively oppressive the contract term, the

23

i.     *Procedural unconscionability*

A.     *Legal standards*

In Washington, procedural unconscionability refers to the lack of meaningful choice, considering all the circumstances surrounding a transaction, including factors such as the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in fine print. (*Torgerson*, *supra*, 166 Wn.2d at pp. 518-519.) The Washington Supreme Court has "stressed that ' "these three factors [should] not be applied mechanically without regard to whether in truth a meaningful choice existed." ' " (*Id.* at p. 519, italics omitted.) In addition, the fact that an arbitration provision exists in a contract of adhesion does not necessarily render such a provision procedurally unconscionable. (*Zuver v. Airtouch Communications, Inc.* (2004) 153 Wn.2d 293, 304 (*Zuver*).)

---

less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' " (*Pinnacle*, *supra*, 55 Cal.4th at p. 247.) Under Washington law, the existence of either substantive or procedural unconscionability alone is sufficient to void the agreement. (*Romney v. Franciscan Med. Group* (2015) 186 Wn.App. 728, 735 (*Romney*), citing *Hill II*, *supra*, 179 Wn.2d at p. 55.) The *Romney* court explained what this distinction may mean in application: "California, unlike Washington, requires both procedural and substantive unconscionability to overturn an arbitration agreement. Because of this, California is more likely to find procedural unconscionability without also finding such procedure to be egregious. In other words, procedural and substantive unconscionability need not be present in the same degree and are considered on a sliding scale." (*Romney*, *supra*, at p. 739.)

B.    *The trial court did not abuse its discretion in considering Monterey's evidence*

Brinkley argues that the trial court erred in admitting the declarations of Lisa Pruitt, a senior manager of client and support services at Monterey, and Chris Hughes, Monterey's president, proffered by Monterey in response to Brinkley's declarations regarding procedural unconscionability. Brinkley also contends that the trial court erred in admitting the RIC, itself, in evidence, arguing that Monterey failed to properly authenticate it.[7] Finally, she contends that even if the trial court properly admitted this evidence, the court erred in failing to hold an evidentiary hearing on these matters.

As Brinkley acknowledges, the trial court's ruling on an evidentiary objection is reviewed for an abuse of discretion. (See *State v. Thomas* (2004) 150 Wn.2d 821, 869 ["The admission or exclusion of evidence is in the discretion of the trial court."]; see also *People v. Waidla* (2000) 22 Cal.4th 690, 717 ["Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence."].)

According to Brinkley, the Pruitt and Hughes declarations "appear to be based on either (1) discussions with REIE employees or review of REIE records, or (2) speculation

---

[7]    In her reply brief, Brinkley expands her argument about the alleged lack of authentification of the RIC, and sets it out as a separate ground for reversal of the trial court's order compelling arbitration—i.e., that Monterey failed to properly establish the existence of an arbitration agreement. Because Brinkley did not raise this as a separate ground for reversal in her opening brief (and as a result, Monterey was not provided with an opportunity to address the argument as a separate ground for reversal), we address Brinkley's evidentiary arguments as they were initially made in her opening brief, as part of her argument regarding the question whether the arbitration clause may not be enforced on the ground of procedural unconscionability.

of what must have happened based on a general understanding of the process."  Brinkley suggests that Monterey was required to provide evidence from a representative of REIE "or anyone else who would have had direct contact with Brinkley when she signed the RIC contract."  We conclude that the trial court did not abuse its discretion in admitting these declarations.

Pruitt declares that in 2011, when Brinkley signed the RIC, Pruitt was the person responsible for "responding to potential buyer inquiries related to REIE's on-line retail installment contracts and helping potential buyers complete the e-signature process," and that because of her former position she is "familiar with the on-line software and application processes Ms. Brinkley was required to follow to sign the agreement at issue here . . . ."  Pruitt explained that Monterey's services to its clients, like REIE, include "facilitating on-line applications relating to retail installment contracts associated with . . . financing [to customers of Monterey's clients]."  Pruitt's declaration established that although Brinkley was contracting with REIE, *Monterey* was the entity that provided the service by which REIE entered into contracts with customers like Brinkley.  *Monterey* therefore possessed first-hand knowledge of the process by which consumers would access and sign the RIC.  Pruitt established her personal knowledge of this process, and could attest to that process without having to have had "discussions with REIE employees or review of REIE records" and without "speculat[ing]" regarding "what must have happened."

Further, the trial court was free to conclude that it believed that the RIC attached to Pruitt's declaration was an accurate copy of the agreement between Brinkley and REIE.

26

"A business record is admissible as competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." (*Bavand v. Chase Home Finance LLC* (2015) (Wn.Ct.App., July 20, 2015) 2015 Wash. App. LEXIS 1569 at *7 (*Bavand*).) Further, courts "interpret the statutory terms 'custodian' and 'other qualified witness' broadly." (*Ibid*.) In addition, Washington statutory law "does not require examination of the person who actually made the record. [Citation.] Testimony by one who has custody of the record as a regular part of his work or who has supervision of its creation will be sufficient to properly introduce the record." (*State v. Iverson* ( 2005) 126 Wn.App. 329, 337-338.) Pruitt's declaration in this regard was sufficient to demonstrate to the trial court that the RIC was a true and correct copy of the agreement entered into by Brinkley and REIE. The trial court therefore did not err by admitting Pruitt's declaration or the attached RIC.

Because Pruitt's declaration attaches the relevant RIC entered into between Brinkley and REIE, and also provides information regarding the process by which consumers would access the RIC and complete the e-signature process, Hughes's declaration, which was intended merely to provide the foundation for the admission of evidence of the RIC between Brinkley and REIE, was rendered redundant and thus, unnecessary. The trial court's decision not to sustain Brinkley's objections to it, however, does not amount to an abuse of discretion, given that the trial court could have been

27

satisfied that Hughes also was aware of the manner in which Monterey's records were kept.

We are similarly unconvinced by Brinkley's contention that the trial court should have held an evidentiary hearing in order to resolve evidentiary conflicts that exist based on the parties' submitted declarations. Brinkley contends that there is a "sharp[ ]" dispute about "whether the RIC contract upon which the motion is based is the correct one." She bases this on a statement in her declaration in which she indicates that, because she received a copy of the signed agreement from Monterey, and not from REIE, she "ha[s] no idea if such document is, in fact, the actual document that I electronically signed online on August 24, 2011."

Despite this statement in Brinkley's declaration, the trial court could have reasonably concluded that it should accord greater weight to Pruitt's declaration, to which the RIC, including Brinkley's electronic signature, was attached, given Pruitt's testimony regarding her role in keeping Monterey's business records pertaining to REIE's installment contracts with customers. The court therefore had no need to hold an evidentiary hearing to take live witness testimony, and it did not abuse its discretion in declining to do so.

C. *Application of procedural unconscionability standards*

Brinkley asserts that the arbitration clause is procedurally unconscionable because "it did not offer [Brinkley] a meaningful choice" given the manner in which the contract was entered, and it failed to provide her with a " 'reasonable opportunity to understand

28

the terms,' " in part on the ground that the contract did not include or attach the AAA rules that it was incorporating.

### 1. *Brinkley did not lack a meaningful choice*

Brinkley contends that she was not given "a meaningful choice" because "she (1) was not given any opportunity to make changes to the pre-printed online agreement, (2) was not allowed adequate time to review all of the terms or to have an attorney review it, (3) did not have any power to negotiate the terms, (4) was informed she had to sign the agreement in order to get financing as it was presented on a take-it-or-leave-it basis, (5) never received a copy of the signed agreement from REIE, and (6) never received a copy of the assignment."

Brinkley's first, third, and fourth contentions refer to the adhesive nature of the RIC. It is true that Brinkley had no opportunity to make changes to the terms of the agreement or negotiate price or other terms, and that her ability to obtain financing from REIE was nonnegotiable and dependent on her entering into the RIC as offered. However, in our view, the fact that the RIC is a contract of adhesion does not, by itself, render it procedurally unconscionable such that the arbitration provision included in the RIC may not be enforced. (See *Zuver*, *supra*, 153 Wn.2d at p. 304.) In *Zuver*, the Washington Supreme Court held that in the context of an employment agreement, the existence of unequal bargaining power between the parties is insufficient to demonstrate that an arbitration provision was procedurally unconscionable, despite the employee's contention that the "unequal bargaining power precluded her from ' "enjoying a meaningful opportunity to negotiate and choose the terms of the contract." ' " (*Id.* at p.

29

305.)[8]  Rather, an employee "must show some evidence that the [party with the greater bargaining power] refused to respond to her questions or concerns, placed undue pressure on her to sign the agreement without providing her with a reasonable opportunity to consider its terms, and/or that the terms of the agreement were set forth in such a way that an average person could not understand them."  (*Id.* at pp. 306-307.)  We therefore consider whether other aspects of the transaction indicate that Brinkley was not provided any meaningful choice in the matter.

In addition to her claims regarding the adhesive nature of the agreement, Brinkley contends that she was "not allowed adequate time to review all of the terms or to have an attorney review it."  Brinkley states in her declaration:  "I was not allowed adequate time to review all of the terms of REIE's pre-printed online agreement or meet with any attorney or have an attorney review the agreement prior to electronically signing my agreement with REIE."[9]  Notably, Brinkley does not state how much time she was provided to review the terms of the five-page document.  However, Brinkley first submitted a credit application to REIE in order to obtain financing to purchase the real

---

[8]  Although *Zuver* involved an employment contract, we take guidance from the Washington Supreme Court's analysis regarding procedural unconscionability and find it helpful in considering Brinkley's contentions with respect to the consumer contract at issue here.

[9]  Although providing an individual with time to have an attorney review a contract would clearly suggest the absence of procedural unconscionability, it seems self-evident that many, if not most, consumers who enter into contracts for the purchase of goods or services do not seek out the advice of counsel prior to signing those agreements.  This factor thus adds little to our analysis as to whether the circumstances surrounding the transaction support a finding that the arbitration provision is procedurally unconscionable.

estate classes "on or about August 10, 2011." According to ordinary course of business for REIE and Monterey with respect to these contracts, Brinkley "would have been notified that her credit application was approved and that she could proceed with the e-signature process" on the same day that she applied. Upon being notified of an approval for credit, an applicant like Brinkley was provided "30 days to complete the e-signature process," and during this time period, an applicant would be given "unfettered access to the document on-line."

During the 30-day period after Brinkley received notification that her credit application had been approved, "[o]n August 23, 2011, Monterey sent Ms. Brinkley a follow up email with instructions for completing the application process".[10] Brinkley signed the document on August 24, 2011, approximately 14 days after first having access to the RIC. We are unconvinced that a 14-day period to review a five-page document is "inadequate," notwithstanding Brinkley's conclusory statement in her declaration that she was "not allowed adequate time to review all of the terms of REIE's pre-printed online agreement." In any event, Brinkley's statement regarding the adequacy of the time that she was provided appears to be nothing more than a legal conclusion about the sufficiency of time provided to her to review and understand the RIC, and as such it is of little evidentiary value. (See *Bavand*, *supra*, 2015 Wash. App. LEXIS 1569 at *8-*9

---

[10] The fact that *Monterey*, not REIE, sent Brinkley a "follow up email with instructions for completing the application process" demonstrates the ties between Monterey and its customer, REIE, and further demonstrates that Monterey was the party that facilitated REIE's online applications for credit and its retail installment contracts.

31

[although an expert may provide testimony regarding "an ultimate issue for the trier of fact to determine, a witness may not give legal conclusions"].)

To the extent that Brinkley suggests that she did not have a meaningful choice with respect to the RIC on the ground that she "never received a copy of the signed agreement from REIE," we find this contention to be without merit. The very first line of the document states: "To print this document - right-click on your mouse and select print from the popup menu." Brinkley was provided the opportunity to print and retain (and review repeatedly) a copy of the RIC, with her e-signature, during this process. Given these circumstances, and the fact that Brinkley has not suggested that she was unable to print the document or did not have access to a printer, the fact that Brinkley was given the opportunity to print the document in this manner is sufficient to overcome Brinkley's contention that the RIC should be considered procedurally unconscionable because she did not receive a signed copy of it.[11]

Brinkley's contention that she was not provided with a copy of the assignment of the RIC between REIE and Monterey is of no significance for purposes of our procedural unconscionability analysis. The RIC specifically informs consumers that the "Seller may assign this Agreement to any third party without prior notice to you," and that "[u]pon

---

[11]    Brinkley suggests that the fact that the RIC stated that Brinkley could print a hard copy is insufficient to "rebut Brinkley's declaration that an REIE representative told her to sign the document and did not give[ ] [her] adequate . . . time to review it." We do not read Brinkley's declaration as asserting that the REIE representative compelled or even pressured Brinkley to sign the document without providing her time to review it. Further, Brinkley had been provided the opportunity to access and review the RIC prior to her conversation with the REIE representative.

any such assignment, such third party will become the holder of this agreement and your creditor." Beyond this, the RIC even informs consumers that "Seller intends to assign this agreement to Monterey Financial Services, [I]nc., 4095 Avenida de la Plata, Oceanside, CA 92056 ('Monterey')," and that "[a]fter the assignment of this Agreement to Monterey, all questions concerning the terms of this Agreement or payments should be directed to Monterey at its address indicated above." The portion of the RIC that included signature lines related to an assignment of the contract was specifically marked "TERMS CONTAINED IN THIS BOX ARE NOT PART OF THE BUYER'S AGREEMENT." In these circumstances, the fact that Brinkley was not provided a copy of the assignment between REIE and Monterey did not affect Brinkley's ability to have a meaningful choice with respect to entering into the RIC, nor did it in any way prejudice her ability to understand the terms of the agreement or have a meaningful opportunity to understand her rights and obligations.

2. *The failure to attach the AAA rules does not render the arbitration agreement unconscionable*

Brinkley contends that the arbitration agreement is procedurally unconscionable because she was not given an opportunity to fully understand the terms of the agreement, given that the RIC provided for arbitration to be completed in accordance with the American Arbitration Association (AAA) rules, but failed to include or attach those rules.

It appears that Monterey concedes that neither a copy of the AAA rules nor a link to a relevant version of the rules was attached to or included in the RIC. However, we do not consider this to be a ground for concluding that the entire arbitration agreement is

33

procedurally unconscionable. Although it appears that Washington courts have yet to consider this issue, as other courts have noted, the arbitration rules referenced in the RIC were relatively easily accessible to Brinkley, given that they are available on the Internet, and she was already online completing the e-signature process. (See *Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 691 (*Lane*) [failure to attach a copy of the AAA rules did not render the agreement procedurally unconscionable given that parties could easily access AAA rules on the Internet]; see also, *Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 505, fn. 6 [up-to-date text of AAA rules is available on AAA's Internet site].)

Brinkley points out that in *Brown*, *supra*, 178 Wn.2d 258, the Washington Supreme Court applied *California* law and found procedural unconscionability where an arbitration provision incorporated the AAA rules but did not provide the rules. However, in *Brown*, the court's concern was not the failure of the defendant to attach the AAA rules to the contract at issue, but, rather, the fact that there was "ambiguity concerning which set of [AAA] rules applies," which presented "procedural surprise" to the plaintiffs. (*Brown*, *supra*, at p. 267.) According to the court, this was a particularly problematic issue in that case because the underlying claim involved a question whether the plaintiffs were employees misclassified as independent contractors, and it was thus "unclear whether the parties would arbitrate under the employment rules or commercial rules." (*Id.* at pp. 267-268.) In addition, the defendant had "changed its position several times regarding which set of AAA rules is appropriate," which further resulted in "procedural surprise." (*Id.* at p. 268.)

34

This same degree of "procedural surprise" does not appear to exist under the circumstances of this case, and we are not convinced that California courts would agree with the *Brown* court's application of California law (see, e.g., *Lane*, *supra*, 224 Cal.App.4th at pp. 691-692 [no procedural unconscionability despite adhesion contract referencing AAA rules but not including rules]; *Peng v. First Republic Bank* (2013) 219 Cal.App.4th 1462, 1472 ["failure to attach the AAA rules, standing alone, is insufficient grounds to support a finding of procedural unconscionability"]; *Bigler v. Harker School* (2013) 213 Cal.App.4th 727, 737 [no procedural unconscionability despite failure to attach AAA rules, and even in earlier cases, failure to attach rules was of "minor significance" in analysis]), or that the Washington Supreme Court would see the issue the same way if it were to interpret Washington law in circumstances such as those before us.

ii.     *Substantive unconscionability*

Brinkley contends that the arbitration provision is substantively unconscionable because it (a) "imposes prohibitive costs," (b) requires arbitration to take place in San Diego, California, which is Monterey's place of business, and (c ) "threatens Brinkley with an award of attorney fees against her if she loses."

In contrast with procedural unconscionability, substantive unconscionability involves cases " ' "where a clause or term in the contract is . . . one-sided or overly harsh." ' [Citation.]  However, such unfairness must truly stand out.  ' " 'Shocking to the conscience,' 'monstrously harsh,' and 'exceedingly calloused' are terms sometimes used to define substantive unconscionability." ' "  (*Torgerson*, *supra*, 166 Wn.2d at p. 519.)

35

The existence of substantive unconscionability, alone, is sufficient to support a finding of unconscionability, such that a contract provision may not be enforced. (*Adler v. Fred Lind Manor* (2004) 153 Wn.2d 331, 346-347 (*Adler*).)

### A.     *Arbitration costs*

Brinkley asserts that requiring her to arbitrate her claims imposes prohibitive costs on her. It appears that Brinkley is basing this argument on the filing fees that she would be required to pay pursuant to the AAA rules, as well as the potential costs of traveling to San Diego, California, the venue imposed by the arbitration agreement.[12] Brinkley argues that the AAA rules would require her to pay an initial filing fee of $975 and a "case service fee" or final fee of $300 on her individual claims, not including the arbitrator's fees.[13] She states that these "filing fees alone were more than she could afford to pay REIE toward [the] classes" that she purchased from them. Brinkley also posits that the choice-of-venue provision in the arbitration agreement, which requires her to travel to San Diego, California, where Monterey is based, to engage in arbitration, "further supports her claim that the arbitration costs [are] prohibitive."

An arbitration agreement is unconscionable "when the party opposing arbitration reasonably shows in law or equity that prohibitive costs are likely to render the arbitral

---

[12]     As we discuss in section III.B.2.b.ii.B., *post*, the arbitration agreement includes a fee and cost shifting provision that requires the arbitrator to shift all fees and costs, including the fees charged by the arbitrator for his or her time, to the nonprevailing party. Because of the way that Brinkley has framed her arguments, we do not consider that provision in this section, but instead, focus on the default rules concerning the potential costs to Brinkley of being required to arbitrate her claims.

[13]     The record includes the AAA rules, of which the trial court took judicial notice.

36

forum inaccessible." (*Mendez v. Palm Harbor Homes, Inc.* (2002) 111 Wn.App. 446, 465.) Washington has "adopted a burden-shifting analysis" for considering challenges that an arbitration clause "effectively denies [a plaintiff] the ability to vindicate her rights" because of prohibitive costs. (*Gandee v. LDL Freedom Enters.* (2013) 176 Wn.2d 598, 604 (*Gandee*).) The party opposing arbitration on substantive unconscionability grounds must present evidence that arbitration would impose prohibitive costs. (*Ibid.*) " '[A]n affidavit describing [the party's] personal finances as well as fee information obtained from the American Arbitration Association[ ]' can be sufficient to meet this burden. [Citation.] The party seeking arbitration can then present offsetting evidence as to the likelihood of bearing those costs." (*Ibid.*, quoting and citing *Adler*, *supra*, 153 Wn.2d at p. 353.)

The evidence that Brinkley has supplied demonstrates that her filing costs for the arbitration may be approximately $975 plus $300, for a total of $1,275, which, she contends, is more than she was able to "put down" as a down payment for the real estate classes she purchased from REIE, which was $850. She also cites to her declaration, in which she states that she is a " 'single mother of limited financial means' " who " 'did not have the funds to pay for the coaching classes' "—classes that she signed up for in order " 'to try to improve [her] financial condition.' " She concludes that she does " 'not have the financial ability to afford the payment of hundreds, let alone thousands of dollars in arbitration fees.' "

With respect to costs of travel to the site of the arbitration, unlike the plaintiff in *Gandee*, *supra*, 176 Wn.2d at page 604, Brinkley did not submit any specific information

37

about the costs that she might have to bear if required to travel to San Diego to arbitrate her individual claims. However, she asserts that although she "did not list the travel and lodging costs she would have necessarily incurred for an arbitration in San Diego, that level of proof was unnecessary when she already established she could not even afford the filing fees and arbitrator's fees." She contends that it is essentially irrelevant that she chose to file a class action lawsuit in San Diego because "the economics of a class action in California, where costs are shared with other class members, quite differs from the pursuit of an individual claim for $10,000 in statutory damages [citation] in a distant forum."

Monterey asserts in response that, contrary to Brinkley's assertions, the AAA's "Consumer-Related Disputes Supplementary Procedures" (Consumer Supplementary Procedures) would limit Brinkley's costs to a $200 filing fee, and that all other costs would be borne by Monterey, including the arbitrator's fee and the arbitrator's travel or other expenses. Brinkley contends in reply that "the supplemental procedures d[o] not apply, because they only deal[ ] with 'consumable goods or services,' involving products and services for 'personal or household use.' " Brinkley does not provide any further explanation as to why she believes the Consumer Supplementary Procedures do not apply to her dispute with Monterey, and we have difficulty seeing how those AAA rules would not apply in this situation.

The Consumer Supplementary Procedures included in the record before us set forth when these rules apply to a particular dispute:

38

"The Commercial Dispute Resolution Procedures and these Supplementary Procedures for Consumer-Related Disputes shall apply whenever the American Arbitration Association (AAA) or its rules are used in an agreement between a consumer and a business where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use."

The AAA rules are used in the RIC that was entered into between Brinkley, a consumer, and REIE, a business (which then assigned its rights and obligations under the contract to Monterey, another business). REIE had a standardized, systematic application of arbitration clauses with its consumers, evidenced by Brinkley's declaration in which she states that she was not able to change the terms of the RIC, and that it was provided to her on a take-it-or-leave-it basis. In addition, the terms and conditions of Brinkley's purchase of the real estate classes and the financing terms were nonnegotiable, as she further states in her declaration, given that there was no opportunity to negotiate price or the terms of the services. The real estate classes were for Brinkley's personal use. Thus, it appears that the Consumer Supplementary Procedures would apply to this dispute.

Further, Monterey has argued in the trial court and on appeal that the Consumer Supplementary Procedures apply to any arbitration of the underlying dispute. Monterey has thus made a judicial admission that the Consumer Supplementary Procedures, including the fee provisions set forth in those procedures, apply to any arbitration of its dispute with Brinkley; Monterey may therefore be estopped from arguing otherwise at a later point in time. (See *Westway Constr., Inc. v. Benton County* (2006) 136 Wn.App.

39

859, 868 ["The essence of judicial estoppel is the same [as equitable estoppel] in that the party to be estopped must be asserting a position that is inconsistent with an earlier position."]; see also *American Title Ins. Co. v. Lacelaw Corp.* (9th Cir. 1988) 861 F.2d 224, 227 [statements of fact contained in a brief may be considered admissions of the party in court's discretion].)

Given that the Consumer Supplementary Procedures, which limit Brinkley's costs to a $200 filing fee, apply to the arbitration of Brinkley's claims, we conclude that Brinkley has not demonstrated that the fees associated with arbitrating her claims are so prohibitive as to render the arbitration agreement substantively unconscionable on this ground alone.[14]

### B. *Awarding fees and costs to the prevailing party*

We are considerably more concerned with the unfairness of the RIC's fee and cost shifting provision, which Brinkley contends is substantively unconscionable. The RIC's arbitration agreement provides in relevant part:

> "The decision by the arbitrator or arbitrators shall be final and binding on all parties, and may be entered in any court of competent jurisdiction for enforcement. Such a decision *shall include the payment of all fees and costs of the prevailing party*. The determination of the 'prevailing party' shall be made by the arbitrator or arbitrators." (Italics added.)

---

14    Because Brinkley presented no evidence with respect to her potential travel costs, we are unable to consider those costs, relative to her potential recovery on her claims, to assess whether the choice-of-venue provision in the arbitration agreement turns an otherwise not-unconscionable arbitration provision into an unconscionably cost-prohibitive provision.

This provision essentially undermines the fee provisions in the Consumer Supplementary Procedures discussed above, since the arbitration agreement *requires* an arbitrator to award a prevailing party "all [of that party's] fees and costs." This provision thus thwarts a consumer claimant's right under the Consumer Supplementary Procedures to have the *business* bear all of the costs of arbitration with the exception of a limited filing fee, in that under the RIC, if a consumer fails to prevail, he or she will be liable for *all* of those fees (which includes any additional filing or administrative fees, plus the arbitrator's fees and costs).

Potentially even more costly to Brinkley, and more troubling for purposes of our unconscionability analysis, is that this provision appears to shift to the nonprevailing party the prevailing party's attorney fees, in addition to the costs associated with the arbitration. Although Monterey suggests that Brinkley merely "speculates that the language of the RIC Contract could allow the arbitrator to award Monterey attorneys' fees if it prevails," our reading of the provision is the same as Brinkley's. The arbitration agreement requires the nonprevailing party to pay "*all* fees and costs of the prevailing party." (Italics added.) The most reasonable understanding of that phrase is that the nonprevailing party will be required to pay any and all of the fees and costs incurred by the prevailing party in arbitrating the matter before the arbitrator, which would include the attorney fees incurred by that party.

The Washington Supreme Court has concluded that a similar fee and cost shifting provision was substantively unconscionable. In *Gandee*, *supra*, 176 Wn.2d at pages 602, 605 to 606, the relevant fee-shifting provision was as follows: "The prevailing party in

41

any action or proceeding related to this Agreement shall be entitled to recover reasonable legal fees and costs, including attorney's fees which may be incurred." (*Id.* at p. 602.) The plaintiff in *Gandee* argued that the " 'loser pays' provision" was "one-sided and harsh because if she prevails she is already entitled to costs and fees under the [Consumer Protection Act] but is forced to bear the risk of a negative outcome, despite the legislature's intent to encourage consumers to vindicate their rights" by not allowing prevailing defendants to obtain their costs and fees under the relevant statute. (*Id.* at p. 605.)

The *Gandee* court agreed, stating: "Because the 'loser pays' provision serves to benefit only [the defendant] and, contrary to the legislature's intent, effectively chills [the plaintiff]'s ability to bring suit under the [Consumer Protection Act], *it is one-sided and overly harsh*. Therefore, we hold it to be substantively unconscionable." (*Gandee*, *supra*, 176 Wn.2d at p. 606, italics added.) Similar fee-shifting provisions have been determined to be substantively unconscionable because they are, effectively, one-sided in favor of defendants, such that a plaintiff's ability to vindicate his or her rights is undermined. (See *Adler*, *supra*, 153 Wn.2d at pp. 354-355 [clause requiring each party to bear his or her own costs and fees was substantively unconscionable in context of a fee-shifting statute], and *Walters v. A.A.A. Waterproofing* (2009) 151 Wn.App. 316 ["loser pays" provision substantively unconscionable because one-sided and harsh, and therefore unenforceable].)

The fee and cost shifting provision in the RIC effectively undermines a plaintiff's statutory right to bring an action and collect attorney fees if he or she prevails, without

42

having to bear the corresponding risk of having to pay the defendant's fees if he or she does not prevail. Washington statutory law provides that the person injured by a privacy violation is entitled to an award of attorney fees if he or she is the prevailing party, with no reciprocal provision for a prevailing defendant. (See Rev. Code Wash., § 9.73.060 ["A person so injured shall be entitled to . . . a reasonable attorney's fee and other costs of litigation."].) By undermining an injured plaintiff's right to attorney fees without the plaintiff having to bear a concomitant risk of paying attorney fees, the fee and cost shifting provision in the arbitration agreement benefits " 'the party with a substantially stronger bargaining position and more resources.' " (*Adler*, *supra*, 153 Wn.2d at p. 355.) We therefore conclude that the arbitration agreement's fee and cost shifting provision is substantively unconscionable.

### C. *Severability of unconscionable provision*

Given our conclusion that the fee and cost shifting provision is substantively unconscionable, we are next tasked with deciding how to address the unconscionability.

Monterey argues that if this court concludes that any of the terms of the arbitration provision are deemed unconscionable, the appropriate remedy is to sever that term. Brinkley argues that severance of any particular term would be inappropriate because, she contends, severance would require the court to rewrite the parties' agreement, the unconscionability pervades the entire arbitration agreement, and the "illegal clauses operate in concert to eliminate any realistic possibility of relief for consumers."

Under Washington law, "[s]everance is the usual remedy for substantively unconscionable terms, but where such terms 'pervade' an arbitration agreement,

43

[Washington courts] 'refuse to sever those provisions and declare the entire agreement void.' " (*Gandee*, *supra*, 176 Wn.2d at p. 603.) The *Gandee* court had to consider whether three unconscionable provisions in an arbitration clause were severable, or, rather, whether the entire arbitration provision was invalid as a result of the unconscionability. (*Id.* at p. 607.) In applying the relevant rules, the *Gandee* court explained that the arbitration clause was relatively short, in that it was a "four-sentence arbitration clause," (*ibid.*) and that it contained "three unconscionable provisions." (*Ibid.*) The court concluded:

> "Severing all three provisions would significantly alter both the tone of the arbitration clause and the nature of the arbitration contemplated by the clause. The location, fee structure, and timing of the arbitration would be changed. Little would be left of the arbitration 'agreed' to by the parties. On these facts, the unconscionable terms pervade the entire clause and severing three out of four provisions would require essentially a rewriting of the arbitration agreement. Thus, the arbitration clause cannot be severed from the overall contract." (*Ibid.*)

Here, in contrast, we have found one unconscionable provision: the fee and cost shifting provision. That provision essentially consists of a single sentence: "Such a decision shall include the payment of all fees and costs of the prevailing party." Contrary to Brinkley's contention, unconscionability does not permeate the arbitration agreement, but, rather, is found only in this single sentence. The offending sentence can readily be removed from the arbitration agreement without further upsetting the terms of that agreement and without requiring us to rewrite the parties' agreement. We conclude that severing the fee and cost shifting provision is the most reasonable course of action in these circumstances. We therefore sever this language from the RIC. The contract may

44

not be enforced to the extent that it requires an arbitrator to award "all fees and costs of the prevailing party" to that party.

### 3. *The putative class claims*

Brinkley contends that even if the trial court was correct in granting Monterey's motion to compel arbitration, the court nevertheless erred in dismissing the putative class claims, rather than ordering the entire matter to arbitration and allowing the arbitrator to decide whether the parties' arbitration agreement permits class claims.[15]

The arbitration agreement does not expressly state whether class or representative claims may be arbitrated. Although the parties disagree as to the meaning of this silence, and as to whether Brinkley may pursue class arbitration under this arbitration agreement, there is a threshold question regarding whether the determination as to the availability of class arbitration is to be decided by the court or the arbitrator. The parties disagree as to the answer to the question of who decides whether the arbitration agreement allows for class arbitration.

Brinkley asserts that the parties' decision to rely on the AAA rules for arbitration, which includes a provision that the arbitrator is to decide whether the arbitration agreement permits class and/or representative arbitration, constitutes clear and unmistakable evidence that the parties intended to delegate this question to the arbitrator. Monterey contends that the question whether class arbitration is available under this arbitration agreement is to be decided as a gateway matter by the court, relying on

---

[15]    Brinkley has not asserted a representative cause of action pursuant to the Private Attorney General Act.

*Garden Fresh Restaurant Corp. v. Superior Court* (2014) 231 Cal.App.4th 678 (*Garden Fresh*). Monterey asserts that *Garden Fresh* "specifically addressed the narrow issue of whether the trial court or the arbitrator should decide the arbitrability of class claims, and held that classwide arbitrability is a question to be determined by the trial court in the first instance."

Arbitrators derive their powers from the parties' voluntary submission of disputes for resolution in a nonjudicial forum. The primary purpose of the FAA is to ensure that agreements to arbitrate are enforced according to their terms, and arbitration agreements are construed to give effect to the parties' contractual rights and expectations. (*Stolt-Nielsen*, *supra*, 559 U.S. at p. 682.) The parties may agree to limit the issues that they choose to arbitrate, may agree on rules under which an arbitration will proceed, and "may specify with whom they choose to arbitrate their disputes." (*Id.* at p. 683, italics omitted.) Thus, arbitration, as a matter of contract between the parties, is a way to resolve *only* those disputes that the parties have agreed to submit to arbitration. (*Kaplan*, *supra*, 514 U.S. 938.)

It follows, therefore, that an arbitrator has the power to decide an issue only if the parties have authorized the arbitrator to do so. The parties here dispute whether the terms of the RIC authorize the arbitrator, rather than a court, to decide whether class arbitration is available. We now turn to that question.

The initial reference to the AAA rules in the parties' arbitration agreement appears in the first sentence of the arbitration provision:

"By signing this Agreement, you agree that, except as provided below, any claim or dispute arising out of or in any way related to this Agreement . . . *shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association*." (Italics added.)

The question here is: Does the parties' delegation of "any claim or dispute arising out of or in any way related to" the RIC to arbitration, to be resolved by the arbitrator "in accordance with the rules of the American Arbitration Association," constitute a delegation to the arbitrator of the question whether the arbitration agreement permits class arbitration?

The only reference the parties make to Washington law on this point is to *Hill v. Garda CL NW, Inc*. (Wn.Ct.App. 2012) 169 Wn.App. 685 (*Hill I*), reversed on other grounds in *Hill II*, *supra*, 179 Wn.2d at p. 50.[16]

---

16    Given the parties' agreement to apply Washington law to the interpretation of the RIC, we conclude that *Garden Fresh*, *supra*, 231 Cal.App.4th 678, as relied on by Monterey, is not precedential authority in this matter. We also question the applicability of *Garden Fresh* to the facts of this case. The question at issue in *Garden Fresh* was: "Who decides whether an agreement to arbitrate disputes between the parties to the agreement authorizes class and/or representative arbitration *when the contract is silent on the matter*—the arbitrator or the court?" (*Id.* at p. 684, italics added.) In *Garden Fresh*, the parties agreed that the arbitration agreement was silent as to whether the arbitrator or the court was to decide the question whether class arbitration was available. *Garden Fresh*'s analysis provides a "default" rule applicable when the parties have not agreed in the contract itself whether a court or an arbitrator is to decide the question of class arbitrability. In this case, Brinkley asserts that the arbitration provision is *not* silent on the question of who decides this significant issue, and that by incorporating by reference the rules of the AAA, the arbitration agreement in fact delegates the determination of this issue to the arbitrator. In other words, the parties here do not agree that the arbitration agreement is silent as to the question of who decides the availability of class arbitration, and this court must determine whether the parties have specifically contracted to have an arbitrator determine this issue.

Monterey argues that the appellate court opinion in *Hill I*, *supra*, 169 Wn.App. 685 "[c]onfirms" that where, as Monterey argues is the case here, "there is no evidence that could possibly establish an implied agreement to arbitrate class claims, the law precludes compelling class arbitration."

Putting aside the question whether *Hill I*, *supra*, 169 Wn.App. 685 continues to have precedential value (or what the extent of that precedential value may be) after the Washington Supreme Court reversed that opinion and determined that the appellate court erred in not concluding that the entire arbitration agreement at issue was unconscionable (*Hill II*, *supra*, 179 Wn.2d at p. 50), we conclude that *Hill I* is of little assistance with respect to this case, for the same reason that we question the applicability of *Garden Fresh* to the questions raised by the arbitration clause at issue in this case.

In *Hill I*, the appellate court determined that the defendant "did not waive arbitration and that the parties unequivocally agreed to arbitrate the current disputes," and then agreed with the defendant's contention that the trial court had erred in compelling class arbitration, albeit on a ground different from the ground asserted by the defendant. (*Hill I*, *supra*, 169 Wn.App. at p. 697.) The defendant argued that "only an arbitrator may decide whether an agreement permits arbitration on a class-wide basis." (*Ibid.*) The *Hill I* court agreed with the defendant that the trial court *had erred* in ordering class arbitration, but, despite the defendant's contention that the question was one for the arbitrator to answer, the *Hill I* court "reach[ed] this conclusion [i.e., that class arbitration was unavailable to the plaintiff] without deciding whether the arbitrator or the court should decide the availability of class arbitration." (*Ibid*.)

48

As described by the *Hill I* court, the arbitration provision at issue in that case "required [defendant's] employees to grieve and arbitrate 'any claim under any federal, state, or local law . . . related to the employment relationship.' " (*Hill I*, *supra*, 169 Wn.App. at p. 688.) Significantly, the arbitration provision did not require arbitration of any dispute or claim *related to the contract itself*, but, rather, claims related to the " 'employment relationship.' " Given the significant difference between this contractual language and the language in the RIC's arbitration provision at issue here, we find *Hill I* inapplicable to our analysis.[17]

The question we believe we *must* address before reaching any conclusions regarding the propriety of class arbitration under the parties' agreement is: Did the parties delegate to an arbitrator the question whether the agreement allows for class arbitration by specifically referencing the AAA rules and stating that "any claim or dispute arising out of or in any way related to this Agreement" is to be arbitrated?[18]

_____

[17]    Given the language of the arbitration provision in *Hill I*, it appears that the arbitration agreement at issue in *Hill I* was similar to the arbitration agreement at issue in *Garden Fresh*, in that the arbitration agreement was silent as to the delegation of the determination of the class arbitration question.

[18]    We question whether the Washington Supreme Court would agree with the *Hill I* court's analytical framework of deciding the merits of a question before deciding whether the parties agreed to have an arbitrator decide the merits of that question if the Supreme Court was provided the opportunity to address this issue. The *Hill I* court concluded, "As in *Stolt-Nielsen*, only one possible outcome exists under the facts of this case; therefore, we do not remand to either the court or the arbitrator for determination of whether the arbitration agreement allows class arbitration. As a matter of law, the trial court could not compel class arbitration. We remand for individual arbitration." (*Hill I*, *supra*, 169 Wn.App. at p. 699.) However, if the contract clearly and unmistakably delegates the question whether the contract allowed for class arbitration to an arbitrator to decide, then even if "only one possible outcome exists" for answering that question, the parties have

49

In the absence of any Washington authority relevant to answering this question, we consider general rules of contract interpretation and federal authorities regarding the interpretation of arbitration provisions, since the "FAA simply requires courts to enforce arbitration contracts like any other contract." (*Satomi Owners Ass'n v. Satomi*, LLC (2009) 167 Wn.2d 781, 822.) As we have already explained, commercial arbitration agreements, like other contracts, must be enforced according to the intentions of the parties, as evidenced by their terms. (See *Concepcion*, *supra*, 563 U.S. at p. 1745 [under FAA, "courts must place arbitration agreements on an equal footing with other contracts [citation] and enforce them according to their terms"].)

Washington, like California, permits parties to incorporate by a reference the terms of another document into a contract. (*Washington State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co*. (2013) 176

---

contracted to have *the arbitrator*, not *a court*, ultimately state that "one possible outcome." By taking that determination away from the arbitrator, the appellate court failed to give effect to the parties' expressed contractual intentions. Thus, it seems apparent that where the parties dispute whether an issue is for a court or an arbitrator to decide, a court should, as a matter of regular course, first determine whether it is appropriate for the court to make a determination as to a particular issue raised by an arbitration clause, or whether the parties have delegated the determination of that issue to the arbitrator. Only after satisfactorily determining that that issue is one *for the court to decide* (either because the parties delegated that issue to the court, or because the parties were silent on the matter and the issue is considered a "gateway" dispute that is presumptively for the court to decide (see *Howsam v. Dean Witter Reynolds, Inc*. (2002) 537 U.S. 79, 83)), should a court proceed to decide the merits of a particular issue.

Wn.2d 502, 517 ["In general, '[i]f the parties to a contract clearly and unequivocally incorporate by reference into their contract some other document, that document becomes part of their contract.' "]; *Williams Constr. Co. v. Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454 [Under California law, " 'the parties may incorporate by reference into their contract the terms of some other document. . . . For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.' "].)

The RIC provides that disputes "shall be resolved by binding arbitration in accordance with the rules of the [AAA]." Monterey, which was assigned REIE's rights under the RIC, does not dispute that the RIC incorporates by reference the AAA rules.

By incorporating the AAA rules, the RIC also incorporated the "Supplementary Rules for Class Arbitration" (Supplementary Class Arbitration Rules) effective October 8, 2003.[19] The Supplementary Class Arbitration Rules provide, in relevant part: "Upon

---

[19]    The Supplementary Class Arbitration Rules make clear that they apply whenever the AAA rules are referenced: "These Supplementary Rules for Class Arbitrations ('Supplementary Rules') shall apply to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the [AAA] where a party submits a dispute to arbitration on behalf of or against a class or purported class, and shall supplement any other applicable AAA rules. These Supplementary Rules shall also apply whenever a court refers a matter pleaded as a class action to the AAA for administration, or when a party to a pending AAA arbitration asserts new claims on behalf of or against a class or purported class."

51

appointment, *the arbitrator shall determine* as a threshold matter, in a reasoned, partial

final award on the construction of the arbitration clause, *whether the applicable*

*arbitration clause permits the arbitration to proceed on behalf of or against a class* (the

'Clause Construction Award')."  (Italics added.)

When Brinkley signed the RIC, she agreed to the application of the AAA rules to

any arbitration of her claims, including the AAA rule that the arbitrator is to decide the

gateway issue of whether class arbitration is permissible under the parties' agreement.

That rule is thus part of the RIC.[20]  In our view, an agreement that incorporates by

reference terms that address the question at issue, such as the agreements' incorporation

of the AAA rules in the instant case, is not silent regarding the delegation of arbitrable

---

[20]     In addition, the terms of the RIC make clear that the AAA rules would cover such
an issue, even if there was not a specific rule granting the arbitrator the authority to
decide the question of the availability of class arbitration so expressly.  The RIC's
reference to "any claim or dispute" that "aris[es] out of" the RIC would necessarily
include a dispute as to whether class arbitration is permitted under the RIC.  As we have
already explained, the phrase "arising out of" is intended to encompass all disputes
related to the interpretation and performance of the RIC:  A "dispute arise[s] out of" an
agreement when the claim or dispute relates to the interpretation and performance of the
contract itself.  (See *Tracer*, *supra*, 42 F.3d at 1295 ["an arbitration clause that covers
disputes 'arising under' an agreement . . . covered only those disputes 'relating to the
interpretation and performance of the contract itself' "]; *Mediterranean Enterprises, Inc.
v. Ssangyong Corp.* (9th Cir. 1983) 708 F.2d 1458, 1464 ["when an arbitration clause
'refers to disputes or controversies "under" or "arising out of" the contract,' arbitration is
restricted to 'disputes and controversies relating to the interpretation of the contract and
matters of performance' "].)  Therefore, whether the arbitration provision permits class
arbitration (or whether the parties' intended to permit class arbitration under the contract)
is necessarily a matter relating to the interpretation of the contract.  Pursuant to the
language of the RIC, a question that requires interpretation of the contract "shall be
resolved by binding arbitration in accordance with the rules of the [AAA]."

issues to the arbitrator. The parties' agreement to arbitrate their disputes under a specifically designated set of rules, which in turn provide that the arbitrator shall decide whether the parties' arbitration agreement permits class arbitration, is "clear and unmistakable" evidence that the parties intended to delegate the resolution of that question to the arbitrator.

Our conclusion is not novel. Courts in the Ninth Circuit and other circuits have adopted an analysis similar to ours. (See *Zenelaj v. Handybook, Inc.* (ND Cal. 2015) 82 F.Supp.3d 968, 972 [although the question whether the incorporation of the AAA rules demonstrates " 'clear and unmistakable' evidence of the parties' intent to arbitrate arbitrability" is not clearly settled in the Ninth Circuit, "the overwhelming consensus of other circuits, as well as the vast majority of decisions in this district, support Defendant's claim that, in the context of this case, incorporation of the AAA Rules effectively delegates jurisdictional questions, including arbitrability and validity, to the arbitrator"].)

In light of our conclusion that the availability of class arbitration is a matter for the arbitrator to decide, we reverse that portion of the trial court's order compelling Brinkley to arbitrate her individual, but not class, claims. We also reverse the court's order dismissing Brinkley's class claims. The entire matter should be sent to arbitration. The arbitrator shall determine whether Brinkley may continue to pursue relief on behalf of a class in arbitration.

## DISPOSITION

The arbitration provision is enforceable with the exception of that portion of the provision that states, "Such a decision shall include the payment of all fees and costs of the prevailing party." That term is severed from the remainder of the contract because it is substantively unconscionable and may not be enforced.

The trial court's order compelling Brinkley to arbitrate her individual claims is affirmed to the extent that it orders Brinkley to pursue her claims in arbitration. However, it is reversed to the extent that it compels Brinkley to arbitrate her individual, but not class, claims. Further, that portion of the trial court's order dismissing Brinkley's class claims is reversed.

On remand, the trial court shall enter an order compelling the parties to arbitrate Brinkley's claims as framed in the complaint. The parties are to bear their own costs on appeal.

AARON, J.

WE CONCUR:

McINTYRE, Acting P. J.

O'ROURKE, J.