[No. S085594. Mar. 14, 2002.]

J. MICHAEL FLANAGAN, Cross-complainant and Appellant, v.
HONORINE T. FLANAGAN, Cross-defendant and Respondent.

## Counsel

Law Offices of Jerry K. Straub, Jerry K. Staub, Patricia Venegas; Law Offices of John Nouskajian, Jr., and John Nouskajian, Jr., for Cross-complainant and Appellant.

Allen Matkins Leck Gamble & Mallory, Edwin W. Green, A. Kristine Floyd, Bruce W. Hepler and Luke G. Anderson for Cross-defendant and Respondent.

Davis Wright Tremaine, Gary L. Bostwick, Kelli L. Sager, Karen N. Frederiksen and Andrew J. Thomas for CBS Broadcasting, Inc., The Copley Press, Inc., National Broadcasting Company, Inc., ABC, Inc., and Cable News Network as Amici Curiae on behalf of Cross-defendant and Respondent.

## Opinion

**KENNARD, J.**—California prohibits the recording of a telephone call without consent from all parties, but only if the call includes a "confidential communication." (Pen. Code, § 632, subd. (a).)[1] Violation of the law is a misdemeanor (*ibid.*) and may entail a civil penalty of $5,000 or three times the actual damages, whichever is greater (§ 637.2). Our Courts of Appeal have disagreed over the meaning of the critical term "confidential communication." We granted review to resolve that disagreement.

One line of authority holds that a conversation is confidential if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded. (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480 [250 Cal.Rptr. 819] (*Frio*); *Coulter v. Bank of America* (1994) 28 Cal.App.4th 923 [33 Cal.Rptr.2d 766].) Under the other line of authority, a conversation is confidential only if the party has an objectively reasonable expectation that the content will not later be divulged to third parties. (*O'Laskey v. Sortino* (1990) 224 Cal.App.3d 241 [273 Cal.Rptr. 674] (*O'Laskey*); see *Deteresa v. American Broadcasting Companies, Inc.* (9th Cir. 1997) 121 F.3d 460 (*Deteresa*).) We endorse the standard established in *Frio* and *Coulter*.

### I. The California Privacy Act

The California Invasion of Privacy Act (§ 630 et seq.) was enacted in 1967, replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation. (See Comment,

---

[1] All statutory citations are to the Penal Code.

*Electronic Surveillance in California: A Study in State Legislative Control* (1969) 57 Cal. L.Rev. 1182, 1191.) The purpose of the act was to protect the right of privacy by, among other things, requiring that all parties consent to a recording of their conversation.

This case involves subdivisions (a) and (c) of section 632. Subdivision (a) provides: "Every person who, intentionally and without the consent of all parties to a *confidential communication* . . . eavesdrops upon or records the *confidential communication*, whether the communication is carried on among the parties in the presence of one another or by means of telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding [$2,500] or imprisonment . . . not exceeding one year. . . ." (Italics added.)

Subdivision (c) of section 632 addresses the term "confidential communication." It states: "The term 'confidential communication' *includes* any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but *excludes* a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." (*Ibid.*, italics added.)

## II. THE FACTUAL AND PROCEDURAL BACKGROUND

Because this is an appeal from a judgment notwithstanding the verdict, we state the facts in the light most favorable to the verdict. (*Quintal v. Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].)

John and Honorine T. Flanagan married in 1969. John had two children from a prior marriage—J. Michael (Michael) and Carol. He had also adopted Terri Ann, Honorine's daughter from a previous marriage. At the time of the marriage, John was a successful businessman who owned and operated several mortuaries in Southern California. His estate was valued to be at least $22 million.

In 1992, after John had been diagnosed with prostate cancer, his physician prescribed medication to slow the spread of the cancer. In 1993, Honorine began to give John his prescribed monthly injections.

Under John's 1990 estate plan, upon his death Honorine would receive all his property for life, with a power of appointment over the remainder. In

default of appointment, the property would go to Terri Ann. In April 1995, John and Honorine amended the trust to give his grandchildren (Michael's and Carol's children) a remainder interest in his share of the property, but they did not provide anything for Michael or Carol directly.

Sometime in the spring of 1995, Honorine told her manicurist, Dale Denels, that she would pay $100,000 for someone to kill John. In September 1995, Honorine told Denels that she was injecting John with water instead of medicine. Denels began taping her telephone conversations with Honorine.

In March 1996, Denels told Michael that John's life was in danger and she played a tape recording of one of her conversations with Honorine. Michael then met with John and played the tape for him. John moved out of the home he shared with Honorine and moved in with Michael. Soon thereafter he was taken to the University of Southern California's Norris Cancer Clinic. The clinic physician prescribed increased medication, which led to a dramatic decline in the blood marker measuring the spread of John's cancer. This led the physician to conclude that John had not been receiving the prescribed medication during the months before his arrival at the clinic.

John changed his will to divide all his property between Carol and Michael, excluding Honorine and her daughter. In April 1996, he filed for dissolution of the marriage and termination of the trust established by his previous estate plan.

In August 1996, however, John and Honorine reconciled. John returned to the family residence and executed a new estate plan leaving Michael and Carol $150,000 each, with Honorine and Terri Ann receiving the balance of the estate. This was the plan in effect on March 19, 1997, when John died of cardiovascular disease unrelated to his prostate cancer.

Honorine filed this lawsuit against Michael and manicurist Denels, alleging conspiracy, invasion of privacy, and infliction of emotional distress. Honorine alleged Denels violated section 632 by recording her telephone conversations with Honorine without the latter's consent. Michael cross-complained, alleging that after John's return to the family home in the summer of 1996, Honorine, without Michael's knowledge or consent, taped all of Michael's telephone conversations with John.

The case went to trial in 1998. In the first part of a bifurcated trial, the jury rejected all counts of Honorine's complaint against Michael and Denels. It then heard the evidence on Michael's cross-complaint against Honorine.

Honorine testified that she installed a voice-activated tape recorder either at the end of 1995 or the beginning of 1996. She said that she installed the

machine with John's consent and that she did not know her conduct might be illegal. She listened to the tapes daily, keeping those she considered useful and recording over the remainder. She based her suit against Michael partly on the communications on the tapes.

Relying on telephone company records, Michael testified that Honorine had recorded 27 telephone calls between him and his father. He placed nine calls from a cellular phone.[2] Some of the cellular phone calls appeared to be redials when a connection was lost.

Michael introduced into evidence the tapes of three of the telephone calls. He described some of the other calls: one was to get directions to a place where he was to meet with John, four were to remind John to notify the gatekeeper that Michael was coming to visit, and two were to confirm the times and places for meetings. Michael testified that Honorine had forbidden John to speak with him, and Michael considered all of his conversations with his father to be confidential. He did not know his calls were being recorded.

The jury found that 24 calls were confidential[3] and awarded Michael $5,000 for each call, for a total of $120,000, plus punitive damages of $1.2 million. On Honorine's motion for a new trial or for judgment notwithstanding the verdict, the trial court limited Michael's statutory damages to $5,000 and struck the punitive damages award. The court reasoned that multiple conversations involving the same subject should be considered a single violation, and that absent proof of actual damages in excess of the statutory civil penalty of $5,000 (§ 637.2), the constitutional prohibition against excessive fines (see *Hale v. Morgan* (1978) 22 Cal.3d 388 [149 Cal.Rptr. 375, 584 P.2d 512]) limited Michael's general damages to $5,000. Michael appealed.

The Court of Appeal rejected both the trial court's reasoning that constitutional principles limited damages to $5,000, and Honorine's contention that the statute should be construed to provide a single $5,000 award per victim irrespective of the number of recorded conversations. It held that two of the three conversations played to the jury were confidential, but that

---

[2]Section 632.7, enacted in 1992, prohibits intentionally intercepting or recording communications involving cellular telephones and cordless telephones. This prohibition applies to all communications, not just confidential communications. Michael's complaint, however, asserted only a cause of action under section 632, not under section 632.7. Honorine does not claim section 632 is inapplicable to the calls Michael placed from a cellular telephone to a landline telephone.

[3]The record before us does not reveal why the jury found only 24 of the 27 calls confidential. There was evidence that three calls were redials after a cellular phone connection was lost, so it is possible that the jury considered those calls to be a continuation of the previous calls.

because Michael had presented no evidence of the specific content of the remaining conversations, he had failed to prove they were also confidential. It therefore found Michael was entitled to statutory damages of $5,000 for each of the two confidential conversations, for a total of $10,000. Finally, it held that the statute's provision for treble damages excluded recovery of punitive damages.

Michael petitioned this court for review, raising only the conflict in certain Court of Appeal decisions concerning the definition of the phrase "confidential communication" under section 632. He did not question whether section 632 excluded punitive damages. Honorine did not petition for review. Thus, the matter before us is limited to interpreting the phrase "confidential communication" in section 632 and does not include other issues raised in the Court of Appeal.

### III. PRIOR DECISIONS CONSTRUING SECTION 632

As noted earlier, some decisions of our Courts of Appeal have arrived at conflicting definitions of confidentiality. *Frio, supra,* 203 Cal.App.3d 1480, was the first decision to address directly the meaning of "confidential communication" in section 632. During discovery in an action for breach of contract, Richard Frio acknowledged that he had tape-recorded some telephone conversations. He took notes based on the tapes, then rerecorded over the tapes. In a pretrial ruling, the court barred Frio from introducing his notes into evidence, citing section 632, subdivision (d), which provides that "[e]xcept as proof in an action or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible . . . ." Frio sought pretrial review by petitioning the Court of Appeal for a writ of mandate.

The Court of Appeal observed that "[t]he legislative history of section 632 is replete with references to the Legislature's intent to strengthen then existing law by 'prohibiting wiretapping or "electronic eavesdropping" without the consent of all parties to the communication which is being tapped or overheard.' . . . [Citations.]" (*Frio, supra,* 203 Cal.App.3d at p. 1487, italics omitted.) Viewing the test of confidentiality as "an objective one defined in terms of reasonableness" (*id.* at p. 1488) the court reasoned that the nature of Frio's business and the character of the communications showed that the parties would not expect their communications to be simultaneously disseminated to an unannounced second auditor (*id.* at pp. 1489-1490). The court then stated what has become known as the "*Frio* test": "*under section 632 'confidentiality' appears to require nothing more than the existence of a*

*reasonable expectation by one of the parties that no one is 'listening in' or overhearing the conversation."* (*Id.* at p. 1490, italics added.)

In *O'Laskey, supra,* 224 Cal.App.3d 241, however, the Court of Appeal set out a competing standard. Phillip O'Laskey sought to oppose Mike Sortino's summary judgment motion, based on the statute of limitations, by producing a tape recording of a telephone conversation in which Sortino admitted that he had stayed outside the State of California for two weeks. If the statute were tolled during this period, O'Laskey's complaint would have been timely. After reviewing cases discussing reasonable expectations of privacy in criminal and civil contexts, the *O'Laskey* court said: "[W]e distill from this comparison the basic rule that the statute means what it says—and we thus examine whether Sortino *reasonably expected, under the circumstances of the investigator's call, that the conversation would not be divulged to any one else."* (*Id.* at p. 248, italics added.) The Court of Appeal concluded that the call was not confidential because Sortino would expect the *content* of the call to be revealed to other persons. (*Id.* at pp. 248-249.)

Four years later the Court of Appeal in *Coulter v. Bank of America, supra,* 28 Cal.App.4th 923, followed the *Frio* standard. Christopher Coulter, a bank employee who had complained of harassment, secretly recorded his conversations with 11 other employees. Appealing a summary judgment against him, Coulter claimed the conversations were not confidential because he believed the parties knew the substance of the discussion would be passed on to others at the bank. Citing *Frio,* the court in *Coulter* responded that whether "the subject matter might be later discussed has no bearing on whether section 632 is violated." (*Id.* at p. 929.)

Thereafter, in 1997, the United States Court of Appeals for the Ninth Circuit, in a case applying California law, followed the *O'Laskey* standard in *Deteresa, supra,* 121 F.3d 460. Beverly Deteresa was a flight attendant on the flight that O. J. Simpson, a suspect in the murders of Nicole Simpson and Ronald Goldman, took from Los Angeles to Chicago. Anthony Radziwill, a producer for defendant American Broadcasting Corporation (ABC), interviewed Deteresa about appearing on a television show. Unknown to her, he recorded the conversation. When she later declined to appear on the show, ABC used the recorded conversation in its television program. After examining the pertinent California decisions and finding them in conflict, the Ninth Circuit had to predict how our court would resolve that conflict in state authority, and it did so: "[W]e predict that the California Supreme Court would adopt the *O'Laskey* standard, not the *Frio* standard." (121 F.3d at p. 464.) Applying the *O'Laskey* test, the Ninth Circuit held that the conversation between Deteresa and Radziwill was not confidential because

"no one in Deteresa's shoes could reasonably expect that a reporter would not divulge her account . . . ." (*Id.* at p. 465.)

The case before us here illustrates the difference between the two standards. Under the *Frio* test, Michael could prove that his conversations with his father were confidential simply by showing that he had an objectively reasonable expectation that they were not being recorded. Under the *O'Laskey* test, he would also have to prove the content of each conversation, and show that he had an objectively reasonable expectation that no one would divulge that content to a third party.

### IV. THE DEFINITION OF "CONFIDENTIAL COMMUNICATION" IN SECTION 632

 Section 632, subdivision (c), has two clauses. The first clause states that " 'confidential communication' *includes* any communication carried on in circumstances that may reasonably indicate that any party to the communication desires it to be confined to the parties thereto"; the second clause "*excludes* a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." (Italics added.)

*O'Laskey*'s conclusion that a conversation is confidential only if a party has an objectively reasonable expectation that its content will not be disseminated to others does not conform with the import of the first clause. "Includes" is "ordinarily a term of enlargement rather than limitation." (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1101 [17 Cal.Rptr.2d 594, 847 P.2d 560].) The "statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions." (*People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 639 [268 P.2d 723].) Thus the *O'Laskey* standard, under which the phrase "confidential communication" not only *includes* but is *limited to* conversations whose content is to be kept secret does not conform to the inclusive language of section 632, subdivision (c). This incompatibility disappears, however, if the phrase "confined to the parties" in the first clause of subdivision (c) is interpreted to refer to the actual conversation, not its content. So construed, the first clause includes within the statutory protection any conversation under circumstances showing that a party desires it not to be overheard or recorded. The second clause then excludes a conversation under circumstances where the party reasonably believes it will be overheard or recorded. Under this construction, the two clauses of section 632 do not conflict nor

leave any uncertainty; they act together in harmony to prohibit unconsented-to eavesdropping or recording of conversations regardless of whether the party expects that the *content of the conversation* may later be conveyed to a third party.

This construction of section 632 draws support from our discussion of the California Invasion of Privacy Act (Privacy Act) in *Ribas v. Clark* (1985) 38 Cal.3d 355 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417] (*Ribas*). *Ribas* explained: "In enacting [the Privacy Act], the Legislature declared in broad terms its intent 'to protect the right of privacy of the people of this state' from what it perceived as 'a serious threat to the free exercise of personal liberties [that] cannot be tolerated in a free and civilized society.' (Pen. Code, § 630.) This philosophy appears to lie at the heart of virtually all the decisions construing the Privacy Act." (38 Cal.3d at p. 359.)

*Ribas* also drew a critical distinction between eavesdropping upon or recording a conversation and later disseminating its contents. We explained: "While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or a mechanical device." (*Ribas, supra*, 38 Cal.3d at pp. 360-361.) We repeated that language in *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 234 [74 Cal.Rptr.2d 843, 955 P.2d 469], and *Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 915 [85 Cal.Rptr.2d 909, 978 P.2d 67].

By focusing on "simultaneous dissemination," not "secondhand repetition" (*Ribas, supra,* 38 Cal.3d at p. 360), the *Frio* definition of "confidential communication" that we here endorse better fulfills the legislative purpose of the Privacy Act by giving greater protection to privacy interests than does the *O'Laskey* standard. The latter protects against recording or eavesdropping only if a party seeks to keep the *content* of the conversation secret.

We also find support for the *Frio* definition of "confidential communication" in the actions of the Legislature when it amended the Privacy Act to take account of privacy issues raised by the increased use of cellular and cordless telephones. (See § 632.5, added by Stats. 1985, ch. 909, § 3, p. 2902; § 632.6, added by Stats. 1990, ch. 696, § 4, p. 3269; § 632.7, added by Stats. 1992, ch. 298, § 6, p. 1216.) In enacting the first of these amendments, the Legislature found that "the advent of widespread use of cellular radio telephone technology means that persons will be conversing over a

network which cannot guarantee privacy in the same way that it is guaranteed over landline systems." (Stats. 1985, ch. 909, § 2, p. 2900; similar language as to cordless telephones appears in Stats. 1990, ch. 696, § 2, p. 3268.) Responding to the problem of protecting the privacy of parties to calls involving cellular or cordless telephones, the Legislature prohibited the malicious interception of calls from or to cellular or cordless phones (§§ 632.5, 632.6) and the intentional interception or recording of a communication involving a cellular phone or a cordless phone (§ 632.7).

Significantly, those statutes protect against interception or recording of *any* communication. When the Legislature determined that there was no practical means of protecting cordless and cellular phone conversations from accidental eavesdropping, it chose to protect all such conversations from malicious or intentional eavesdropping or recording, rather than protecting only conversations where a party wanted to keep the content secret. The scope of this prohibition indicates, as we suggested in *Ribas, supra,* 38 Cal.3d at pages 360-361, that the Legislature's ongoing concern is with eavesdropping or recording of conversations, not later dissemination. It would be anomalous to interpret the Privacy Act as protecting all cellular or cordless phone conversations, but only those landline conversations that the parties intended to keep secret—especially because, as here, many conversations take place between persons using different types of telephones.

■ Under the construction adopted here, the Privacy Act is a coherent statutory scheme. It protects against intentional, nonconsensual recording of telephone conversations regardless of the content of the conversation or the type of telephone involved. In contrast, the *O'Laskey* standard urged by Honorine and adopted by the Court of Appeal would provide significantly less protection from surreptitious eavesdropping or recording when both telephones are landline telephones, a distinction that lacks any justification in terms of the purpose of the Privacy Act.[4]

## V. DISPOSITION OF THE APPEAL

There were 27 telephone calls between Michael and his father. The jury found that 24 of the calls were confidential and awarded $5,000 in damages for each call, a total of $120,000. The Court of Appeal's conclusion that only two of the 27 telephone calls were confidential was based on the standard of *O'Laskey, supra,* 224 Cal.App.3d 241, which we have rejected in this opinion. The Court of Appeal must now reconsider the issues on appeal in light of our conclusion that a conversation is confidential under section 632

---

[4]We disapprove language in *O'Laskey v. Sortino, supra,* 224 Cal.App.3d 241, that is contrary to the views expressed in this opinion.

if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded.

The judgment of the Court of Appeal is reversed, and the case is remanded for further proceedings consistent with this opinion.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.