Filed 8/3/18

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DAVID LACAGNINA,<br><br>　　　Plaintiff and Appellant,<br><br>　　　v.<br><br>COMPREHEND SYSTEMS, INC. et al.<br><br>　　　Defendants and Respondents. | A147559<br><br>(San Mateo County<br>Super. Ct. No. CIV 528251) |

　　　After a 10-day trial, a jury ruled in favor of appellant David Lacagnina on his claims for fraud, breach of contract, and breach of the covenant of good faith and fair dealing against respondents Comprehend Systems, Inc. (Comprehend) and its two cofounders, Richard Morrison and Jud Gardner. From June 1, 2012 to November 20, 2013, when he was terminated, Lacagnina worked for Comprehend as vice president of business development. The gist of Lacgnina's claims was that he was fraudulently induced to enter into an employment agreement with Comprehend by false representations made to him by Morrison and Gardner. The jury rendered a special verdict and awarded Lacagnina a total of $556,446 in damages, including $226,446 in damages for fraud and $75,000 for emotional distress. However, the trial court granted respondents' motion for judgment notwithstanding the verdict on the fraud claim on the ground that Lacagnina was not damaged by the alleged fraud, and entered an amended judgment against respondents in the amount of $255,000. Lacagnina now appeals from

---

　　　* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.A.

1

that judgment, and from the trial court's order granting respondents' motion for nonsuit. We will reverse the judgment in part and affirm in part.

In the published portion of this opinion, we reject Lacagnina's contention that an employee who recovers a judgment against an employee for lost compensation has suffered a "theft" of "labor" for which he or she is entitled to recover treble damages and attorneys' fees under Penal Code Section 496, subdivision (c).

## I. STATEMENT OF FACTS

"Because this is an appeal from a judgment notwithstanding the verdict, we state the facts in the light most favorable to the verdict." (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 769.) Likewise, "[i]n reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' [Citation]." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)

### A. Background

In 2010, Richard Morrison and Jud Gardner founded a new company called Comprehend Systems (Comprehend). They were in the process of developing a software product, Comprehend Clinical, that would assist pharmaceutical companies and others in managing and tracking data from clinical drug trials. Morrison and Gardner, both software engineers, had limited capital and no background in sales.

Around the same time, in 2010, Lacagnina also started a new company, e-Clinical Agency (e-Clinical). E-Clinical was designed to sell multiple software products from multiple vendors for use by small and medium-sized pharmaceutical companies in clinical drug trials. Lacagnina had over 30 years of business experience, including starting several companies, and considerable sales experience. His plan was to build e-Clinical as his last start-up venture, and retire after four or five years on the "reoccurring revenue stream" that would pay a commission each time a product he sold was used.

As part of his work with e-Clinical, Lacagnina became familiar with Comprehend and its product, which he believed could be a "game changer" in the industry. Initially, Lacagnina and Morrison reached an oral agreement that e-Clinical would receive a 60 percent commission on any sale of Comprehend's product that Lacagnina could secure

2

before the end of the year. In February 2012, that oral agreement was replaced with a written sales referral agreement for a one-year term in which e-Clinical agreed to sell Comprehend's product in exchange for a 30 percent commission.

At the time the agreement was entered into, Comprehend had not closed any sales of its product and did not have a single "referenceable" customer (that is, a company that could credibly vouch for it in marketing to other prospective customers or discussions with potential venture capital investors). Further, at the time, Comprehend had only limited seed money, and it was hoping to secure an "angel" investor to secure the financing it needed. Morrison asked Lacagnina to speak with one such investor, Life Science Angel Network, which invested in Comprehend shortly after meeting with Lacagnina.

### B. Lacagnina Is Employed by Comprehend

In May 2012, just as Lacagnina's 18 months of work at e-Clinical building sales relationships in the pharmaceutical industry was "starting to get some traction," Morrison asked Lacagnina to leave e-Clinical and come to work full time for Comprehend. Lacagnina believed in Comprehend's product, but he had a number of concerns that he wanted addressed, and that he discussed with Morrison. In particular, Lacagnina made clear to Morrison that at "at my age I only wanted to work four or five years," which had been his plan at e-Clinical. Morrison told Lacagnina that because of Comprehend's limited funds, he could only afford to pay him $50,000, plus stock options and benefits. Lacagnina was told that once the company got its initial customers and funding, he would be brought up to a compensation package with a base salary of $150,000 and would receive additional stock options. Lacagnina asserted that he "was led to believe this was a partnership going forward" and that he believed he would be "treated as a partner."

In an email dated May 31, 2012, entitled "My understanding of your offer," Morrison forwarded comments to Lacagnina on his employment offer, stating, "Please take a look at them and let me know what you think, and I'll resend the offer letter." In the email, Morrison proposed two options for Lacagnina's compensation, a $50,000 non-recoverable draw plus 20 percent commission, or a straight $50,000 base salary with

15 percent commission. Under the heading "Commission," the email stated, "You will currently receive commission on all accounts. However, we are going to bring on additional salespeople, at which point we will split up some accounts based on everybody's strengths/connections. You will obviously be involved in all of these decisions, and help us figure out how best to navigate." Under "Building the team," Morrison said, "I cannot promise you anything regarding your management position as we grow. Like I said on the phone, you and I are going to start building the sales team and developing a repeatable sales process. I will do my best to make sure that you get to go in whatever direction you're interested in, whether that's developing new markets or managing a group of salespeople. I can promise won't [sic] be any surprises and that we very much look to decide using objective metrics about what's best for the company." Lacagnina relied on the statements in the offer letter in accepting employment with Comprehend.

The next day, June 1, 2012,[1] Lacagnina signed a written employment agreement with Comprehend by which he became director of business development, reporting to Morrison. It stated that he would receive a base salary of $50,000, plus a 20 percent commission "on the customer sales for which you are responsible." It stated further, "It is expected that you will be involved in all Company sales up until the time when we hire other salespeople, at which point you wouldn't receive commission for their sales. Any such commission payment shall be deemed earned upon booking by the Company . . . ." It also stated, "we will recommend to the Board that you be granted an option under the Company's 2012 Stock Plan . . . to purchase 90,000 shares of Common Stock," vesting over four years, with 25 percent vesting on the first anniversary of Lacagnina's start date and 1/48th of the total shares vesting each month thereafter, subject to his being employed and in good standing on each such vesting date.[2] The agreement purported to

---

[1] Lacagnina asserts incorrectly that the agreement was dated June 20, 2012.

[2] Lacagnina actually received only 50,000 options. Morrison acknowledged that was a mistake. Although the mistake was discovered in June 2013, when the company

reserve Comprehend's right to "modify job titles, duties, salaries, and benefits from time to time as it deems necessary," and stated, "your employment with the Company is for no specified period and constitutes at will employment."[3]  It also contained an integration clause:  "This letter, along with the agreement referred to two paragraphs above, set forth the terms of your employment with the Company and supersedes any prior representations or agreements, whether written or oral, or whenever made."

### C.  Lacagnina's Tenure with Comprehend

For the next year, Lacagnina worked to promote and sell Comprehend's product to his former e-Clinical contacts (such as Knopp Biosciences, LLC and Boston Scientific), as well as to develop new accounts (with companies such as Atlantic Research Group and Versartis).  He also transferred ("exported") prospective customers' contact and other information from e-Clinical's Salesforce.com database into Comprehend's database for its use.

Through Lacagnina's efforts, Comprehend secured its first sales, and one of Lacagnina's former e-Clinical contacts, Knopp Biosciences, became Comprehend's first referenceable customer, providing it with a case study describing how Comprehend's product had addressed a problem it was having and asserting, "Comprehend was worth its weight in gold."  Later, Knopp and other companies that Lacagnina was cultivating agreed, at Lacagnina's request, to speak with venture capital firms, such as Sequoia Capital, to generate "Series A" investment interest in Comprehend's product. Lacagnina's efforts were successful, and in mid-2013, Sequoia agreed to invest $5.5 million in Comprehend—an amount that was subsequently increased.

In late May or early June 2013, following Sequoia's commitment, Lacagnina met with Morrison and Gardner for his annual review and a discussion of his compensation.

_____

was doing its due diligence for the Series A financing, Morrison could not recall informing Lacagnina of the oversight.

[3] Lacagnina understood that without the at-will provision, it would have been harder for Morrison and Gardner to attract new investors.  When he saw the provision, he told Morrison that "I would never sign this agreement if I didn't know you guys were in control and if I didn't trust you and if you weren't treating me like a partner."

In his review, Lacagnina gave Morrison and Gardner a list of things he felt that he had accomplished, and asked them if they disagreed; they did not, and said, "We love what you're doing. Just keep doing what you're doing." Neither said anything negative in his review. In a June 10, 2013 follow-up email, Lacagnina wrote to them, "I'm happy you guys like what I'm doing and enjoying working with me, the feeling is mutual." He summarized in writing what he believed his contributions to the company had been to date. In response, Morrison wrote back, "We definitely enjoy working with you, and want to make sure that you're compensated properly and continue to be a core part of Comprehend as we grow the company to be everything we know it can be!"

Shortly thereafter, on or about June 19, 2013, Lacagnina met with Morrison and Gardner to discuss the terms of an amended employment agreement, which Lacagnina was told by Morrison he would have to sign to ensure the Sequoia deal closed. During that discussion, Lacagnina was told he would continue to receive a 20 percent commission on all sales up to $2 million. In addition, Morrison and Gardner assured Lacagnina that the investment third parties had made in his company, e-Clinical, would be repaid, and it was agreed the repayment would be for $250,000 (rather than the full investment amount of $300,000).

However, the written amended offer letter did not contain the terms Lacagnina expected and believed had been agreed to. With respect to commission payments, it stated that commissions would be deemed earned on "each customer contract that you are responsible for closing," "as determined by [Comprehend] in its sole discretion," and upon the customer making a payment to Comprehend for the sale, among numerous other conditions, including that Lacagnina must be "an employee of [Comprehend] actively at work and performing to [Comprehend's] satisfaction on the date a commission is determined to be earned." None of those conditions had been discussed in the parties' negotiations. In Lacagnina's view, the preconditions to earning a commission were "egregious" because satisfying them was "not possible at the position that Comprehend was in." Further, the amended offer letter made no mention of repayment of the $250,000 e-Clinical investment, instead increasing the maximum level of sales on which

6

Lacagnina could earn a 20 percent commission rate from $2 million to $2,250,000, and it terminated the sales referral agreement between Comprehend and e-Clinical. Lacagnina was concerned about the latter change, as he was not in a position to give up e-Clinical's agreement with Comprehend.

Concerned about the changes that Morrison and Gardner had made, Lacagnina called Morrison and told him he wanted to have the amended offer letter reviewed by a lawyer. Morrison told him there was no time for such a review because the closing on the financing was scheduled for the next day. However, Morrison told him, "You got to trust me. We'll revisit this." Gardner similarly told him not to worry. Relying on those assurances, Lacagnina signed the amended offer letter on June 21, 2013.

### D. A New Sales Executive Is Hired and Lacagnina Is Terminated

In August 2013, without Lacagnina's knowledge or input—and despite the prior assurance that he would "obviously be involved" in hiring "additional salespeople"—Comprehend extended an offer of employment to Lee Black, a personal friend of Morrison's, as Vice President of Sales. Morrison did not tell Lacagnina of his intention to hire Black, and Lacagnina was not involved in the decision to hire him or in any discussion about how compensation would be divided between Black and Lacagnina. Black began working at Comprehend in September 2013. One month later, in October 2013, Lacagnina was directed to "transition" his accounts to Black, thereby depriving Lacagnina of the ability to earn commissions on sales. Lacagnina resisted the directive because he was concerned that he would lose the sales opportunities those contacts represented, and with them any way of earning a commission on any sales. At the time, there were accounts that were closing or on the verge of closing.

One month later, on November 20, 2013, Lacagnina was abruptly terminated. Neither Morrison nor Gardner informed Lacagnina, orally or in writing, that they had discussed terminating him as early as June 2013. Nor did they "follow the letter . . . of the employee handbook," which called for the company to follow a policy of progressive employee discipline, beginning with an oral reprimand, followed by a written reprimand, suspension, and finally termination. In a meeting, Morrison told Lacagnina, "This is your

last day today." When Lacagnina asked why, Morrison responded, "Because you're not technical enough." Gardner said, "You just don't fit our profile." They did not provide him with any other reason. Morrison gave Lacagnina a file with a check in it, saying, "this is all we owe you." He requested that Lacagnina sign a separation agreement, which he declined to do.

Lacagnina was "shocked" and "devastated" by the unexpected termination. After the Thanksgiving holiday, he was so depressed that he went to see a doctor, who prescribed him medication for depression and anxiety. At the time of trial, Lacagnina still had not recovered, financially or emotionally, from being terminated.

## II. PROCEDURAL HISTORY

### A. Lacagnina's Complaint

On April 29, 2014, Lacagnina filed a complaint for damages against Comprehend, Morrison, and Gardner, asserting claims for fraud, violation of Penal Code section 496, subdivision (a), breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, quantum meruit, age discrimination under the Fair Employment and Housing Act, intentional and negligent interference with prospective economic relations, and reformation of contract. The gist of Lacagnina's fraud claim was that as a result of defendants' fraudulent representation, he "never received full compensation, or the opportunity to obtain full compensation, for his work as represented by Defendants." He claimed to have suffered lost wages and benefits in excess of $2.25 million, plus benefits and stock options. He also sought to recover damages for "extreme anguish, humiliation, and emotional distress" exceeding $500,000.[4]

### B. Comprehend's Motion for Summary Judgment

---

[4] Lacagnina later was granted leave to file an amended complaint making certain minor corrections and changes, which was filed on July 9, 2015. During trial, Lacagnina sought leave to file a second amended complaint amending his claim for breach of contract to allege that Comprehend had failed to issue 40,000 shares of promised stock options. (See footnote 2, *supra*.) That motion was granted and the second amended complaint was deemed filed.

8

Defendants moved for summary judgment or, in the alternative, for summary adjudication of issues as to the entire complaint. As to Lacagnina's fraud claim, defendants contended that the purported misrepresentations were not actionable fraud and were not justifiably relied upon by Lacagnina, who was bound by the terms of his at-will employment agreement with Comprehend. In response, Lacagnina argued that defendants had engaged in promissory fraud by, among other things, concealing their intent to employ him at Comprehend no longer than it took to attract enough customers to obtain needed financing, and then to replace him with Black. Defendants did not assert that if fraud was established, Lacagnina could not prove that he suffered any harm. As to the Penal Code claim, Lacagnina asserted that "the theft at issue was Morrison's theft of Lacagnina's contacts, industry knowledge, and other trade secrets, developed when Lacagnina was a re-seller with [e-Clinical]. Based on the false pretenses described in Section A above, Lacagnina had to transfer the data contained in his Salesforce.com account and convert it for Comprehend's use, even after it had terminated Lacagnina."

The trial court denied the motion in its entirety, finding that "there are triable issues of material fact for every cause of action." As to the fraud cause of action, the court ruled, "There are questions of fact for the trier of fact to decide, including whether the statements by Defendants were lies, or material omissions, whether Plaintiff relied upon them, and whether the reliance was justified." As to the claim for violation of the Penal Code, the trial court found that triable issues of fact remained unresolved, including whether Lacagnina voluntarily turned over his contacts to defendants or was required to do so and whether defendants used false pretenses to obtain those contacts and the data in Lacagnina's Salesforce.com account.

9

### C. Comprehend's Motion for Nonsuit

A ten-day jury trial commenced on July 20, 2015. Following the close of evidence, Comprehend brought a motion for nonsuit on Lacagnina's claims for fraud, violation of the Penal Code, breach of contract, quantum meruit, age discrimination, and intentional and negligent interference with prospective advantage.[5]

Comprehend's motion for nonsuit as to the fraud claim was based on the assertion that Lacagnina had "admitted during his trial testimony that his reliance on the alleged promise to revisit the amended offer letter was not, in fact, reasonable." The trial court, observing that Comprehend's argument was based on a portion of testimony taken out of context, found there was sufficient evidence to submit the claim to the jury, and denied the motion.[6]

As to Lacagnina's claim under the Penal Code, Comprehend asserted that "there certainly hasn't been any evidence offered during trial that anybody stole anything from anybody." In response, Lacagnina asserted—apparently for the first time—the theory that "the fraudulent obtaining of labor would be theft of labor by false pretense" within the meaning of Penal Code, section 484. Asserting that section 496, subdivision (a) permits the recovery of treble damages for receiving stolen property, Lacagnina's counsel contended that "the way the two code sections [Penal Code, sections 484 and 496, subdivision (a)] work is that one person—and, in this case, it would be Richard Morrison—obtained labor by false pretense, and another person—and, in this case, Comprehend since Comprehend is considered a person under the law—received it." The trial court, finding that "there's no evidence to support this at all," granted the motion for nonsuit.[7]

---

[5] Although Comprehend apparently filed a written motion, the parties have not included it in the record on appeal.

[6] The trial court also denied Comprehend's motion for nonsuit as to the claim for breach of contract.

[7] The trial court also granted Comprehend's motion for nonsuit on the cause of action for age discrimination. Lacagnina's claim for specific performance of an alleged promise to issue stock options was rejected by the court on the ground that it was already

10

**D. The Jury's Verdict**

After deliberating for two days, the jury found in favor of Lacagnina on each of the three claims on the special verdict form. First, the jury found Lacagnina proved that defendants "made a false representation or concealment on which he reasonably relied that harmed him." Second, it found Lacagnina proved that Comprehend "breached a contract to compensate him with salary, commissions and/or stock options." Third, it found Lacagnina proved that Comprehend "breached an implied covenant of good faith and fair dealing by failing to compensate him with certain commissions and/or stock options."

The jury awarded Lacagnina economic damages due to fraud and deceit in the amount of $226,446; economic damages due to breach of contract in the amount of $5,000, specifying this amount included 40,000 stock options; economic damages due to breach of the covenant of good faith and fair dealing in the amount of $250,000; and emotional distress damages in the amount of $75,000, for a total of $556,446. The jury unanimously found that Lacagnina failed to prove that any of the defendants "acted with malice, oppression, despicable conduct or fraud with regard to any of the above conduct," thus defeating the predicate for an award of punitive damages.[8]

**E. Comprehend's Motion for Judgment Notwithstanding the Verdict**

Comprehend brought a motion for judgment notwithstanding the verdict (JNOV) asserting, among other things, that Lacagnina "failed to produce substantial evidence that there was actionable fraud by Defendants." In particular, Comprehend claimed that Lacagnina had "unequivocally admitted that his reliance on the purported misrepresentations was not reasonable." Comprehend asserted that Lacagnina's

---

included in the jury's award of damages. Lacagnina has not challenged either of these rulings here. Lacagnina voluntarily dismissed his claims for intentional and negligent interference with prospective advantage and quantum meruit.

[8] As the trial court belatedly observed, the special verdict form approved by the parties incorrectly asked the jury to determine whether Lacagnina had proven the predicate for an award of punitive damages by a preponderance of the evidence, rather than by clear and convincing evidence.

11

purported failure to produce substantial evidence of fraud also mandated setting aside the jury's award of emotional distress damages. Comprehend did not assert that there was no substantial evidence that Lacagnina had suffered compensable harm.

At the hearing on the motion, Comprehend argued principally that because Lacagnina was always an at-will employee who was entitled to commissions only on sales that he closed, he was not harmed by entering into the amended offer letter. The trial court observed that "there was contradictory testimony about whether the statements [made by Morrison and Gardner] were false or not . . . . and I'm not going to substitute my judgment, nor can I in this motion, for what the jury perceived." Asked to identify the harm Lacagnina had suffered from the alleged misrepresentations, his counsel asserted, "had Mr. Lacagnina known the true facts, he would not have signed the amended offer letter." He also asserted that Lacagnina had changed his position by leaving his position with e-Clinical and joining Comprehend, thereby foregoing larger commissions that he would have earned at e-Clinical.

The trial court found that "whether there was an intentional misrepresentation or whether there was concealment, I don't find any harm — substantial harm at all." Accordingly, it granted the motion for JNOV as to the fraud claim. The court, however, denied the motion for JNOV on the breach of contract and breach of the covenant of good faith and fair dealing claims, reasoning that "this soundly rests with[in] the province of the jury, and I'm not going to disturb this portion of the judgment . . . ."

The court thereafter entered an amended judgment in Lacagnina's favor in the amount of $255,000. This timely appeal followed.

### III.   DISCUSSION

**A. The Trial Court Erred in Granting JNOV as to the Fraud Claim.**

Lacagnina contends that the trial court erred in granting JNOV on the fraud claim on the ground that he suffered no harm, asserting that the jury verdict in his favor was supported by substantial evidence. We agree.

Our resolution of this issue is largely determined by the applicable standard of review. "In contrast to ruling on a motion for new trial, ruling on a defendant's motion

12

for judgment notwithstanding the verdict, the trial court may not weigh the evidence or judge the credibility of witnesses. [Citation.] All reasonable inferences must be drawn in favor of the plaintiff and conflicting evidence is to be disregarded. [Citation.] 'A party is entitled to judgment notwithstanding the verdict only if there is no substantial evidence to support the verdict and the evidence compels a judgment for the moving party as a matter of law.' [Citation.] On review, we apply the substantial evidence test to the jury's verdict, ignoring the judgment of the court and reading the record in the light most advantageous to the plaintiff." (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 299; accord, *Flanagan v. Flanagan*, *supra*, 27 Cal.4th at p. 769; *Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510.)

Here, viewing the facts in the light most favorable to the jury's verdict, there was substantial evidence from which the jury could have found that Lacagnina was harmed as a result of misrepresentations or concealment by respondents. In particular, the jury could have found that Lacagnina was induced to join and remain at Comprehend, and to execute the amended offer letter, by respondents' representations that he would be fairly compensated for sales for which he was responsible, and that they would "revisit" the terms of that letter, which stated that Lacagnina would not be entitled to commissions unless he remained employed by Comprehend. It could also have found, as Lacagnina argued, that respondents had a concealed plan to replace Lacagnina with Black, at which point he was compelled to "transition" his accounts to Black, thereby depriving him of the opportunity to earn commissions on sales to those customers, and was then summarily terminated.

Significantly, Lacagnina's theory was supported at trial by the testimony of Comprehend's own damages expert, Charles Mahla, Ph.D. Mahla was retained by Comprehend "to perform a calculation of potential commissions due to Mr. Lacagnina." Mahla testified that if the jury found the conditions of the amended offer letter unenforceable, Lacagnina would be entitled to receive $101,465 in commissions on sales attributable, in whole or in part, to his efforts, for which Comprehend received payment following his termination. In his testimony, Morrison conceded that Lacagnina, in fact,

13

was responsible for those sales in varying degrees, ranging from 25 to 100 percent.[9] Analyzing the same evidence, Lacagnina's expert, Nora Ostofe, opined that Lacagnina should receive $317,439 in lost commissions (exclusive of prejudgment interest) attributable to the sales at issue, based on Lacagnina's testimony regarding the accounts he secured and for which he was responsible. Significantly, the jury's award of $226,446 in fraud damages fell almost exactly in the middle of the damages range presented by the parties' experts.

Thus, there was substantial evidence from which the jury could have found that Comprehend engaged in actionable fraud or concealment resulting in harm to Lacagnina, and for which it awarded damages, and the trial court therefore erred in granting JNOV as to the fraud verdict. Comprehend's defense of the trial court's ruling that Lacagnina did not suffer compensable harm, which comprises a single paragraph devoid of any citation to any authority or to the record, including its own expert's testimony, does not warrant a different conclusion.

Comprehend also argues that there was no evidence of misrepresentation or concealment or of reasonable reliance. However, Comprehend's one-sided discussion of the evidence on those issues is inconsistent with the controlling standard of review, which requires us to draw all inferences in favor of the jury's verdict. As the trial court found in denying Comprehend's motion for JNOV on those grounds, there was evidence from which the jury could have reasonably reached a different conclusion. Indeed, as the single case Comprehend cites in its brief makes clear, " ' "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a *question of fact*." ' " (*Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486, 1498–1499, italics added, quoting *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)

[9] Remarkably, Comprehend's brief does not mention that testimony or its expert's concession. A contention raised in appellant's brief to which respondent makes no reply in its brief will be deemed submitted on appellant's brief. (*Alameda County Management Employees v. Superior Court* (2011) 195 Cal.App.4th 325, 338–339.)

Finally, Comprehend repeats its position below that the parties' written agreements, including the integration clauses in the offer letters, barred Lacagnina from any recovery. The law, however, is to the contrary. The answer to the question "whether an employer who induces an employee to enter into an employment contract by intentionally promising compensation terms the employer never intended to honor may, as a matter of law, avoid tort liability for fraudulent inducement of contract because the contract contains an 'at-will' provision that allows the employer to fire the employee at any time for any reason" is, "of course, no." (*Agosta v. Astor* (2004) 120 Cal.App.4th 596, 599.) Indeed, the availability of remedies for such fraudulent inducement in the employment law context is well established. (See, e.g., *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638–639, 648–649 [former employee who alleged that employer falsely and intentionally represented to him that he would be employed as long as he performed his job, that he would receive significant increases in salary, and that employer was strong financially, stated cause of action for fraudulent inducement of employment contract]; *Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 775–777 [former employees who alleged that defendants concealed the fact that they wanted plaintiffs to remain employed to make the company more attractive to potential buyers, and only intended to give plaintiffs a nominal or no bonus for remaining employed, stated a cause of action for misrepresentation-concealment]; *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 612-613 [reversing summary judgment for employer based on fully integrated written employment agreements unequivocally providing for termination without cause where plaintiffs, former sales representatives, alleged that employer had fraudulently concealed its plan to terminate them].)[10]

---

[10] Comprehend does not challenge the jury's award of $75,000 in emotional distress damages or respond to Lacagnina's argument that if the court reinstates the fraud award, the emotional distress award also must be reinstated. Accordingly, respondents have forfeited any separate challenge to that award.

**B. The Penal Code Claim Lacks Merit.**

Lacagnina appeals from the trial court's nonsuit on his cause of action under Penal Code, section 496.[11]  Lacagnina makes the novel claim that he is entitled to recover treble damages and attorneys' fees under that statute, which makes it a crime to receive stolen property, because Comprehend and its executives engaged in the "theft" or "receipt" of "stolen property," in the form of his labor.  We are not persuaded.

" 'A motion for nonsuit allows a defendant to test the sufficiency of the plaintiff's evidence before presenting his or her case.  Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances.'  [Citation.]  'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor.  [Citation.]'  [Citation]." (*Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208.)  Where "motions for nonsuit raise issues of law [citation], we review the rulings on those motions de novo, employing the same standard which governs the trial court [citation]." (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541–1542.)  Here, the trial court's ruling on Comprehend's motion for nonsuit raises an issue of statutory interpretation on undisputed facts, which we review de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71; *People v. Martinez* (2014) 226 Cal.App.4th 1169, 1181.)

Section 496, subdivision (a) makes buying or receiving "any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained," a criminal offense punishable by imprisonment.[12]  Subdivision (c) provides, "Any person who has been injured by a

---

[11] All statutory references in this section are to the Penal Code.

[12] Section 496, subdivision (a) provides in pertinent part:

Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a

violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorneys' fees."[13]

Lacagnina's argument is twofold.  First, he points out that *Bell v. Feibush* (2013) 212 Cal.App.4th 1041 (*Bell*) held that a criminal conviction under section 496, subdivision (a), is not a prerequisite to recovery of treble damages under section 496, subdivision (c).  Second, he asserts that his labor was taken by "fraudulent representation" or "false … pretense" within the meaning of a second statute, section 484, which defines theft, and therefore (he claims) falls within the definition of "property which may be obtained in a manner constituting theft" under section 496, subdivision (a).  Thus, Lacagnina contends, he is entitled to treble damages and attorneys' fees for the "theft" of his "labor" by Comprehend.  While we agree with the trial court that Lacagnina's novel theory is "creativ[e]", we find it inconsistent with the plain language and structure of the Penal Code, the legislative purpose, and the likely consequences of Lacagnina's interpretation.  (See *People v. Prunty*, *supra*, 62 Cal.4th at p. 76, fn. 4 [in interpreting statute, court focuses on "the statutory language, the legislative purpose, and the likely consequences of a particular interpretation"].

We start, as we must, with the plain statutory language.  Lacagnina contends that section 496 "contains a civil remedy for, among other things, 'theft' of 'labor' procured by misrepresentation or false pretense."  But it does not.  Section 496, which bears the

county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170.  However, if the value of the property does not exceed nine hundred fifty dollars ($950), the offense shall be a misdemeanor, punishable only by imprisonment in a county jail not exceeding one year . . . .

[13] Subdivision (b) makes it a crime for swap meet vendors and other persons whose principal business is dealing in, or collecting, merchandise or personal property, to buy or receive stolen property under specified circumstances.  Like subdivision (a), it applies to "property . . . that has been stolen or obtained in any manner constituting theft or extortion."

heading "Receiving stolen property,"[14] makes no reference to labor.  Rather, it is limited by its terms to the purchase or receipt of "any *property* that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the *property* to be so stolen or obtained . . . ."  (§ 496, subd. (a), italics added; see also *id.*, subd. (b) [same]).  But the crux of the issue is that labor is not "property" as that term is used in the Penal Code.  "[T]he Penal Code defines property to include 'both real and personal property' and further defines personal property to include 'money, goods, chattels, things in action, and evidences of debt.'  (§ 7, pars. (10), (12).)"  (*People v. Gonzales* (2017) 2 Cal.5th 858, 871.)  The statutory definition makes no reference to labor or other services.  Nor is there any indication of any intent to use the term "property" in section 496 more broadly than the definition of the same term already provided by the Penal Code.  " ' "[W]hen the Legislature uses a term of art, a court construing that use must assume that the Legislature was aware of the ramifications of its choice of language." ' [Citation.]" (*Ibid.*)

Nor does Lacagnina's reliance on section 484 help him.  That statute provides the following broad definition of theft: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, *by any false or fraudulent representation* or pretense, *defraud any other person of* money, *labor* or real or personal property, . . . , is guilty of theft."  (§ 484, subd. (a), italics added.)  The italicized language appears in a clause codifying the common law crime of theft by false pretense, which includes defrauding another person of labor by false or fraudulent representation.  (See *People v. Williams* (2013) 57 Cal.4th 776, 784–788; *Bell*, *supra*, 212 Cal.App.4th at p. 1048.)  However, section 484 defines *theft*, not

---

[14] " 'The policy sought to be implemented [by a statute] should be respected [citation], and to this end, titles of acts, headnotes, and chapter and section headings may properly be considered in determining legislative intent' [citation]."  (*People v. Romanowski* (2017) 2 Cal.5th 903, 913, quoting *Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 489.)

*property*; that labor may be the object of a "theft" does not transform it into "stolen property."

Indeed, we find it significant that while section 484 refers to labor, section 496 does not. The difference in language between the two statutes, which are found in the same statutory scheme, is further evidence that the Legislature did not intend "property" as that term is used in section 496 to include "labor"; otherwise, it would not have used different terms in the two statutes. " ' We examine the statutory language in the context in which it appears, and adopt the construction that best harmonizes the statute internally and with related statutes. [Citations.]' [Citations.]" (*People v. Whitmer* (2014) 230 Cal.App.4th 906, 917.) Both our Supreme Court and the High Court "have cautioned against reading into a statute language it does not contain or elements that do not appear on its face. [Citations]. This caution is especially pertinent when the legislative body has shown it knows how to add the element in express terms when it wishes to do so." (*Martinez v. Regents of the University of California* (2010) 50 Cal.4th 1277, 1295.) The Legislature showed in section 484 that it knows how to refer to "labor" as an object of "theft" when it wishes to do so, but it did not use that term in section 496. It follows that labor does not constitute "stolen property" within the meaning of that statute.

To be sure, courts have observed that " '[a]nything that could be the subject of a theft can also be property under section 496.' " (*Bell v. Feibush*, *supra*, 212 Cal.App.4th at p. 1049 (*Bell*).) However, that broad dictum does not assist Lacagnina, since in *Bell*, "Feibush was found liable for fraud, i.e., for the fraudulent acquisition of property (money) from its owner (Bell)." (*Ibid.*) Lacagnina does not cite any reported case, nor have we been able to identify one, in which a court has deemed labor or services a form of "property" that can be stolen, as distinct from personal property, whether tangible or intangible. (Cf. *People v. Kozlowski* (2002) 96 Cal.App.4th 853, 864–869 [Personal Identification Number (PIN) code used to access bank automatic teller machines is intangible personal property capable of being extorted]; *People v. Gopal* (1985) 171 Cal.App.3d 524, 541 [copy of stolen trade secrets]; *People v. Norwood* (1972) 26 Cal.App.3d 148, 157 [county warrant]; see also *People v. Kunkin* (1973) 9 Cal.3d 245,

19

249 [assuming, without deciding, that Attorney General personnel roster listing names, home addresses, and home telephone numbers of undercover narcotics agents was "property" within the meaning and intended scope of section 496].)

Even if section 496 could apply to the theft of labor, Lacagnina's theory of recovery is flawed. While a criminal conviction of section 496 may not be a prerequisite to recovery of treble damages, the underlying conduct still must constitute a violation of that statute. "[T]o sustain a conviction for receiving stolen property, the prosecution must prove (1) the property was stolen; (2) the defendant knew the property was stolen; and, (3) the defendant had possession of the stolen property." (*People v. Land* (1994) 30 Cal.App.4th 220, 223; see also CALCRIM No. 1750.) Here, several essential elements of a claim under section 496 were not met. First, in plain English, the "property" in question (Lacagnina's labor) was not "stolen"; rather, he received a contractually agreed-upon salary, and had a dispute with his employer about the amount of commissions and other compensation due him on termination.

Second, Lacagnina's labor was not "stolen" *at the time* Comprehend allegedly defrauded him out of the disputed compensation. Section 496, subdivision (a) refers to "property that *has been stolen* or that *has been obtained* in any manner constituting theft." (§ 496, subd. (a), italics added.) "Which is to say, when the property in question comes into the defendant's hands, *it must already have the character of having been stolen*." (*Grouse River Outfitters Ltd v. NetSuite, Inc.* (N.D. Cal. Oct. 12, 2016) 2016 WL 5930273 at *14 (*Grouse River*) [dismissing § 496, subd. (c) claim with prejudice].)[15] But Lacagnina's entitlement to the lost commissions that the jury apparently awarded as damages[16] did not arise until Comprehend completed sales to the

---

[15] Unreported federal court cases may be cited in California as persuasive authority. (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 940.)

[16] We agree with Lacagnina that it is reasonable to infer that the jury calculated the fraud damages "as the commission income due on the accounts for which Mr. Lacagnina was responsible, and which Comprehend failed to pay despite its prior assurances."

relevant customers, which necessarily was *after* he had exerted efforts to obtain those sales.

Third and finally, an essential element of a section 496 violation is the defendant's *knowledge* that the property was stolen. Whatever it may mean to say that an employer "know[s]" that an employee's labor is "stolen," we doubt that a dispute over unpaid commissions and other compensation qualifies. (*Grouse River*, *supra,* 2016 WL 5930273 at *16.) In short, while we reinstate the jury's award of damages for fraud, "[t]he plain language of § 496(a) prevents [plaintiff] from leveraging that alleged fraud into a damages-trebling § 496(a) violation." (*Id.* at *15.)

For these reasons, we find no ambiguity in the statutory language, and therefore no need to consult its legislative history. (See *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [if statutory language is clear and unambiguous, no need to resort to indicia of the intent of the Legislature].) We nevertheless have scrutinized the legislative history, which does not support Lacagnina's position. Senate Bill No. 1068 (1972 Reg. Sess.), which ultimately created section 496, subdivision (c), " 'was introduced at the request of the California Trucking Association, with the goal of eliminating markets for stolen property, in order to substantially reduce the incentive to hijack cargo from common carriers.' " (*Bell*, *supra*, 212 Cal.App.4th at p. 1047, quoting *Citizens of Humanity, LLC v. Costco Wholesale Corp.* (2009) 171 Cal.App.4th 1, 17–18, disapproved on another ground in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337.) When introduced, the bill provided for a civil action by any public carrier injured by the knowing purchase, receipt, concealment, or withholding of stolen property, but it was subsequently amended to expand the class of potential plaintiffs to include any person injured by a violation of section 496. (*Bell* at p. 1047.) *Bell* concluded the legislative history showed that "the Legislature believed the deterrent effect of criminal sanctions was not enough to reduce thefts. The means to reduce thefts, the Legislature concluded, was to dry up the market for stolen goods by permitting treble damage recovery by 'any person' injured by the knowing purchase, receipt, concealment, or withholding of property stolen or obtained by theft." (*Ibid.*; accord, *Citizens of Humanity*, *supra*,

21

171 Cal.App.4th at p. 18 ["Penal Code section 496, as amended, has as its goal the elimination of markets for stolen merchandise by allowing those injured by the sale of knowingly stolen merchandise to recover damages"]. It is difficult to fathom, to say the least, how imposing treble damages in an employment dispute over unpaid sales commissions could advance the legislative purpose to "dry up the market for stolen goods." Moreover, we note that to the extent that the statutory treble damages provision was intended to deter misconduct, the punitive damages claim that Lacagnina asserted—unsuccessfully—served the same function.

Finally, we note that significant adverse consequences would likely follow from Lacagnina's proposed interpretation of the statute. (See *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165 ["When uncertainty arises in a question of statutory interpretation, consideration must be given to the consequences that will flow from a particular interpretation"].) If every plaintiff in an employment or contract dispute could also seek treble damages and attorneys' fees on the ground that the defendant received "stolen property," such claims would become the rule rather than the exception, parties would more frequently assert claims for "theft" in run-of-the-mill commercial disputes, and cases would be harder to settle. We cannot believe the Legislature contemplated, much less intended, those consequences when it enacted section 496, subdivision (c). (See *Corley v. San Bernardino County Fire Protection District* (2018) 21 Cal.App.5th 390, 397 [in interpreting a statute, " ' " ' "[w]e must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " ' "].)

## IV. DISPOSITION

The order granting Comprehend's motion for nonsuit as to the claim under Penal Code section 496 is affirmed. The order granting the JNOV motion is reversed and remanded with directions to the trial court to deny the motion and enter a corrected judgment for Lacagnina. The parties shall bear their own costs on appeal.

22

_____

Schulman, J.[*]


We concur:


_____

Streeter, Acting P.J.


_____

Reardon, J.

_____

[*]Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

_Lacagnina v. Comprehend Systems, Inc._ (A147559)

23

Trial Court: San Mateo County Superior Court

Trial Judge: Hon. Steven L. Dylina

Counsel for Appellant: Steven F. Henry

Counsel for Respondent: Gordon & Rees, Don Willenburg, Michael A. Laurenson